IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| HECTOR HERNANDEZ and<br>CHARLES TERMINI, individually, and<br>on behalf of all others similarly-situated,<br><br>Plaintiffs,<br><br>v.<br><br>WILLIAM HELM, in his individual<br>capacity; KEVIN MARTIN, in his<br>individual capacity; and the<br>CITY OF CHICAGO, as a municipal<br>corporation and indemnitor,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 18 C 7647<br><br>District Judge Lee<br><br>Magistrate Judge Schenkier |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Hector Hernandez and Charles Termini work for the City of Chicago's Department of Aviation ("DOA") as motor truck drivers. They have brought claims under 42 U.S.C. § 1983 and the Illinois Whistleblower Act, as well as other related claims, against the City of Chicago ("the City"), William Helm, and Kevin Martin (*see* doc. # 13: Am. Compl.).[1] On September 11, 2019, defendants moved to disqualify plaintiffs' lead attorney for an alleged ethical violation (doc. # 67: Defs.' Mot.). Five days later, plaintiffs countered with their own motion to disqualify "Corporation Counsel" for alleged ethical violations, which was followed shortly by a supplemental filing (doc. # 71: Pls.' Mot.; doc. # 76: Pls.' Suppl.).[2] Both motions are fully briefed.

---

[1] Plaintiffs also sued Jamie Rhee in her official capacity as Commissioner of the DOA and Joseph Alesia in his individual capacity, but both Ms. Rhee and Mr. Alesia were later dismissed from this suit (docs. ## 13, 27, 61). We further note that although plaintiffs have styled their suit as being brought "on behalf of all others similarly-situated" and have included class allegations (Am. Compl., at 1, 14-15), they have not moved to certify a class.

[2] We understand "Corporation Counsel" to mean Jessica Durkin and Scott Crouch, who are attorneys from the City's Department of Law representing the City and Mr. Martin. They also represented Mr. Helm until October 28, 2019 (docs. ## 18, 53, 93).

As we stated at the October 29, 2019 status hearing, an evidentiary hearing is necessary to resolve the issues raised in defendants' motion to disqualify (doc. # 100). Thus, this Memorandum Opinion and Order addresses only plaintiffs' motion to disqualify Corporation Counsel. For the following reasons, we deny plaintiffs' motion.[3]

## I.

We have broad discretion in deciding whether to disqualify a party's attorneys. *Ross v. United States*, 910 F.2d 1422, 1432 (7th Cir. 1990); *Schloetter v. Railoc of Ind., Inc.*, 546 F.2d 706, 710 (7th Cir. 1976). In exercising this discretion, we are mindful that disqualification "is a drastic measure which courts should hesitate to impose except when absolutely necessary." *Freeman v. Chi. Musical Instrument Co.*, 689 F.2d 715, 721 (7th Cir. 1982). "Because disqualification causes a disruptive, immediate, and measurable effect on one party in pending litigation" and because motions to disqualify "can be misused as techniques of harassment," courts view such motions with extreme caution. *Id.* at 722; *alfaCTP Sys., Inc. v. Nierman*, No. 15-cv-9338, 2016 WL 687281, at *4 (N.D. Ill. Feb. 19, 2016).

Nonetheless, disqualification may be appropriate when an attorney violates his or her ethical duties. *Harris Davis Rebar, LLC v. Structural Iron Workers Local Union No. 1, Pension Tr. Fund*, No. 17 C 6473, 2019 WL 447622, at *3 (N.D. Ill. Feb. 5, 2019). Courts in this district follow a two-step analysis for determining whether an alleged ethical violation warrants the drastic measure of disqualification: (1) we consider whether there is an ethical violation, and, if so (2) we determine whether disqualification is the appropriate remedy. *E.g., Freeman Equip., Inc. v. Caterpillar, Inc.*, 262 F. Supp. 3d 631, 634 (N.D. Ill. 2017); *Guillen v. City of Chicago*, 956 F.

---

[3] On September 16, 2019, the district judge referred the motion addressed by this opinion to this Court for resolution (docs. ## 73, 74). Motions to disqualify counsel are non-dispositive matters governed by Federal Rule of Civil Procedure 72(a) and 28 U.S.C. § 636(b)(1)(A). *Medgyesy v. Medgyesy*, 988 F. Supp. 2d 843, 845 n.1 (N.D. Ill. 2013); *Fish v. Hennessy*, No. 12 C 1856, 2012 WL 3643829, at *1 (N.D. Ill. Aug. 22, 2012).

Supp. 1416, 1421 (N.D. Ill. 1997). The moving party "bears a heavy burden of proving the facts required for disqualification." *Dahleh v. Mustafa*, No. 17 C 8005, 2018 WL 1167675, at *1 (N.D. Ill. Mar. 5, 2018).

## II.

As a threshold matter, plaintiffs' motion erroneously relies upon the Illinois Rules of Professional Conduct ("Illinois Rules"), when it is the American Bar Association's Model Rules of Professional Conduct ("ABA Model Rules") that govern the conduct of attorneys practicing before this Court. N.D. Ill. L.R. 83.50; *Nieves v. OPA, Inc.*, 948 F. Supp. 2d 887, 894-95 (N.D. Ill. 2013). To the extent an attorney is admitted to practice in Illinois, the Illinois Rules only come into play for a "matter not addressed by the ABA Model Rules or for which the ABA Model Rules are inconsistent with" the Illinois Rules. N.D. Ill. L.R. 83.50. Plaintiffs have not explained why the matters they raise are not addressed by the ABA Model Rules or are matters for which the ABA Model Rules are inconsistent with the Illinois Rules. Thus, we evaluate plaintiffs' arguments in light of the ABA Model Rules.

## A.

Plaintiffs first contend that Corporation Counsel have violated ABA Model Rule 4.2 (Pls.' Mot. at 3-6). Rule 4.2 states, in relevant part, that "[i]n representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter[.]" Model Rules of Prof'l Conduct r. 4.2 (Am. Bar Ass'n 9th ed. 2019).[4] Comment four to Rule 4.2 goes on to state that "[a] lawyer may not make a communication prohibited by this Rule through the acts of another." *Id.*, cmt. [4]. Even so, "[p]arties to a matter may communicate directly with each other[.]" *Id.*

---

[4] All subsequent citations to the "Model Rules of Prof'l Conduct" will be to the 2019 9th edition.

Plaintiffs do not contend that Corporation Counsel have themselves directly communicated with plaintiffs. Rather, plaintiffs contend that Corporation Counsel are violating Rule 4.2 by communicating with plaintiffs through their DOA co-workers.[5] Specifically, plaintiffs assert that:

- on or about December 27, 2018, former defendant Mr. Alesia talked to Mr. Hernandez and pressured him to drop the lawsuit;

- on or about July 10, 2019, Mr. Thome told Mr. Termini that defendant Mr. Helm wanted him to stop the investigation and end the lawsuit; and

- on or about July 16, 2019, Mr. Rivera told Mr. Hernandez that Mr. Helm said that Mr. Hernandez would be rewarded if he dropped the lawsuit.

(Pls.' Mot. at 3-5; doc. # 71-6: Hernandez Decl., ¶¶ 2-4; doc. # 71-7: Termini Decl., ¶ 2).[6] Then, during a conference call on or about July 19, 2019, plaintiffs' counsel informed Corporation Counsel about this "ongoing direct contact" between plaintiffs and their co-workers (Pls.' Mot. at 5; Termini Decl., ¶ 3). According to plaintiffs, Corporation Counsel responded to this information "with disdain, incredulity, and ridicule," and the behavior of plaintiffs' co-workers has since

---

[5] These individuals include Mr. Helm, a former Deputy Commissioner with the DOA; Mr. Alesia, an Airport Manager with the DOA; Nick Thome, a Motor Truck Driver Foreman with the DOA; and Benji Rivera, whom Mr. Hernandez identifies simply as a co-worker (*see* doc. # 32: City's Answer, at ¶¶ 19-20; doc. # 67-2, at 4-11: Thome Decl. & Exs., ¶¶ 1-3; doc. # 71-6: Hernandez Decl., ¶ 2; doc. # 82: Pls.' Resp. to Defs.' Mot., at 13 (noting that Mr. Helm no longer works for the City)).

[6] We question the admissibility of the declarations offered by Mr. Hernandez and Mr. Termini to support their motion. Although both plaintiffs state that they were "duly sworn and under oath," there is no indication that plaintiffs made their statements in the presence of someone authorized to administer an oath, such as a notary public. *See Home Sav. of Am., F.A. v. Einhorn*, No. 87 C 7390, 1990 WL 114643, at *4 (N.D. Ill. July 24, 1990) ("[A]s a general rule, affidavits under federal law must evidence that they were sworn to before someone qualified to administer oaths. A notary's acknowledgement generally states 'subscribed and sworn to before me,' indicating that the affiant did indeed take an oath before an individual authorized to administer an oath") (internal citation omitted); *Brooks v. Cmty. Mem'l Hosp. of Menomonee Falls, Inc.*, No. 17-CV-659, 2018 WL 2860019, at *1 (E.D. Wis. June 11, 2018) (a declaration stating that the declarant was "duly sworn on oath" was not "actually submitted under oath" because "it [was] not notarized and it lack[ed] any sort of jurat or seal").

Thus, plaintiffs' declarations are "unsworn declaration[s] that can be admissible only pursuant to 28 U.S.C. § 1746." *Trapaga v. Cent. States Joint Bd. Local 10*, No. 05 C 5742, 2007 WL 1017855, at *2 (N.D. Ill. Mar. 30, 2007). But plaintiffs' declarations do not satisfy Section 1746 either, because neither plaintiff declared that his statements were "true under penalty of perjury." 28 U.S.C. § 1746; *Mokry v. Partylite Worldwide, Inc.*, No. 07 C 0972, 2009 WL 2588888, at *7 (N.D. Ill. Aug. 20, 2009); *see also Home Sav. of Am.*, 1990 WL 114643, at *4 ("The words 'sworn on oath' in [the affiant's] affidavit do not demonstrate that he knew he was signing under the penalty of perjury"). Despite these omissions, we have considered plaintiffs' declarations in deciding this motion.

continued (Pls.' Mot. at 5; Termini Decl., ¶ 3). For instance, plaintiffs assert that on or about August 8, 2019—a few weeks after the July 19 conference call—Mr. Thorne told Mr. Termini that Mr. Helm promised to take care of Mr. Termini if he would drop the lawsuit and that there would always be a place in the Training Section for Mr. Termini if he did so (Pls.' Mot. at 5; Termini Decl., ¶ 4). Additionally, plaintiffs assert that Mr. Hernandez became aware on September 19 and 20, 2019 that his co-workers were circulating a "meme" labeling him as corrupt, dishonest, a liar, and a "beefer" (Pls.' Suppl. at 1-2).

Missing from these assertions is any evidence that Corporation Counsel directed any of plaintiffs' co-workers to talk to them about anything pertaining to this lawsuit or to engage in any of the aforementioned conduct. At best, plaintiffs have shown that in January 2019, Corporation Counsel knew that plaintiffs alleged that Mr. Alesia pressured Mr. Hernandez the previous month to drop the lawsuit (*see* Am. Compl., ¶¶ 74-76) and that in July 2019, Corporation Counsel were aware of additional alleged encounters between plaintiffs and their co-workers (Termini Decl., ¶ 3). This awareness, however, does not translate into instructions or encouragement from Corporation Counsel to plaintiffs' co-workers to communicate about the litigation with plaintiffs. In short, plaintiffs have provided no evidence suggesting that Corporation Counsel has violated Model Rule 4.2 by communicating with them through others.

### B.

Next, plaintiffs claim that Corporation Counsel violated Rules 3.4 and 4.4 by intimidating witnesses in this case (Pls.' Mot. at 6-8). Under ABA Model Rule 3.4, a lawyer is prohibited from assisting "a witness to testify falsely," and under ABA Model Rule 4.4, a lawyer shall not, in representing a client, "use means that have no substantial purpose other than to embarrass, delay, or burden a third person, or use methods of obtaining evidence that violate the legal rights of such

a person." Model Rules of Prof'l Conduct rr. 3.4(b), 4.4(a). Plaintiffs assert that Corporation Counsel have intimidated them and their attorneys, as well as Nick Thome.

### 1.

Plaintiffs' first assertion—that Corporation Counsel have intimidated them and their attorneys—relies upon the allegations of "direct contact" we addressed in section II.A and other alleged "specific acts of intimidation that have occurred throughout this case" (Pls.' Mot. at 7), including the circulated meme described in plaintiffs' September 21 supplemental filing (*see* Pls.' Suppl.). But plaintiffs have presented zero proof that Corporation Counsel are directing or otherwise encouraging plaintiffs' co-workers to engage in the complained-of acts. Put another way, plaintiffs provide no justification for attributing the complained-of acts to Corporation Counsel. Thus, the alleged actions of plaintiffs' co-workers do not provide a basis for us to find that Corporation Counsel violated any of the ethical duties laid out in Model Rules 3.4 and 4.4.

### 2.

Plaintiffs' second assertion focuses on Mr. Thome. In connection with defendants' motion to disqualify plaintiffs' counsel, Mr. Thome provided a September 10, 2019 declaration about communications he allegedly had with plaintiffs' lead counsel (which are central to defendants' motion to disqualify) (*see* doc. # 67-2, at 4-11: Thome Decl. & Exs.). Mr. Termini contends that Mr. Thome approached him on or about September 9, 2019 and stated, in effect, "that 'the Law Department was harassing him to sign a document,' that he had 'received numerous phone calls from the Law Department about the document,' that he was 'uncomfortable signing the document,' [and that] 'he was scared and did not know what to do'" (Termini Decl., ¶ 5).[7] Mr. Termini also states that Mr. Thome said that he (Mr. Thome) was interviewed in August 2019 by the City's

---

[7] Although Mr. Termini does not identify the document to which Mr. Thome was allegedly referring, we presume it is Mr. Thome's September 10 declaration.

Office of Inspector General ("OIG") about allegations related to receiving and selling Cubs tickets (*Id.*, ¶ 6). According to Mr. Termini, Mr. Thome appeared concerned and anxious in the workplace during August and September 2019 (*Id.*).

None of this constitutes evidence that Corporation Counsel violated either Rule 3.4 or Rule 4.4.[8] For one thing, Rule 3.4(b) prohibits the procurement of *false* testimony, and, yet, plaintiffs' motion does not direct us to any portion of Mr. Thome's September 10 declaration that is purportedly inaccurate or untrue (Pls.' Mot. at 6-7).[9] Moreover, calling Mr. Thome an unspecified number of times so that he can sign a declaration does not "violate [his] legal rights." *See* Model Rules of Prof'l Conduct r. 4.4(a). Nor is there any indication that Corporation Counsel called or attempted to contact Mr. Thome in order "to embarrass, delay or burden" him. *Id.* There is also no indication that Corporation Counsel knew about Mr. Thome's alleged discomfort and fear; thus, there is no basis for us to find that Corporation Counsel's actions were any less proper in the face of these alleged emotions. And although being interviewed by the OIG might reasonably cause Mr. Thome to be concerned or anxious, there is no evidence that the OIG interviews were conducted for an improper purpose, such as to make Mr. Thome more pliable for the submission of a declaration, or that the interviews were coordinated in any way with Corporation Counsel's defense of this litigation. In any event, the Model Rules do not prohibit a lawyer from obtaining

---

[8] For purposes of our discussion, we assume the admissibility of Mr. Thome's alleged statements, as recounted by Mr. Termini. Nevertheless, we note that because plaintiffs are relying upon Mr. Termini's recounting of these alleged statements to prove the truth of Mr. Thome's alleged intimidation, the statements are likely inadmissible hearsay. *Burton v. Kohn Law Firm, S.C.*, 934 F.3d 572, 583 (7th Cir. 2019) ("A statement made out of court and offered to prove the truth of the matter asserted is hearsay and is not admissible into evidence"); *see also Orlowski v. Milwaukee Cty.*, 872 F.3d 417, 424 n.4 (7th Cir. 2017) (inadmissible hearsay statements cannot be considered at summary judgment).

[9] We recognize that Mr. Thome states that plaintiffs' counsel texted him to obtain Mr. Alesia's phone number, whereas plaintiffs' counsel, in responding to defendants' motion to disqualify, claims to have no knowledge of doing this (*compare* Thome Decl., ¶¶ 11-13 & Ex. B, *with* doc. # 82-1: Casper Decl., at ¶¶ 4-5). But plaintiffs do not argue that this statement from Mr. Thome is false or that Corporation Counsel improperly influenced this statement (*see* Pls.' Mot. at 6-7; doc. # 84: Pls.' Reply).

information from a non-party witness. Mr. Thome's alleged stress did not make the Corporation Counsel's interactions with him improper.

## C.

Moving on, plaintiffs argue that Corporation Counsel should be disqualified based on their failure to preserve a videotape of an alleged December 26, 2018 interaction between Mr. Hernandez and Mr. Alesia (Pls.' Mot. at 8-9).[10] Plaintiffs assert that this failure (1) violates ABA Model Rule 3.4, which prohibits a lawyer from "unlawfully alter[ing], destroy[ing] or conceal[ing] a document or other material having potential evidentiary value[,]" Model Rules of Prof'l Conduct r. 3.4(a); and (2) "constitutes at least negligent, if not intentional, spoliation of evidence" (Pls.' Mot. at 8-9). Defendants agree that the December 26 videotape no longer exists—it was apparently overwritten after 30 days—but contend that they never had a duty to preserve the videotape in the first place (doc. # 78: Defs.' Resp., at 6-7). Defendants further contend that because the security videos related to this case do not contain audio, the December 26 videotape would not have assisted plaintiffs in defending against defendants' evidence regarding what Mr. Hernandez said during the alleged interaction (*Id.* at 7).

The Seventh Circuit has recognized that "Illinois law imposes no general duty to preserve evidence," *Schaefer v. Universal Scaffolding & Equipment, LLC*, 839 F.3d 599, 609 (7th Cir. 2016), but we disagree with defendants' attempt to apply that proposition here (*see* Defs.' Resp. at 6). The "duty to preserve documents and other information that may be relevant" is fundamentally ingrained in our system of federal litigation. *Danis v. USN Commc'ns, Inc.*, No. 98 C 7482, 2000 WL 1694325, at *1 (N.D. Ill. Oct. 20, 2000). "A party has a duty to preserve evidence

---

[10] In responding to defendants' motion to disqualify, plaintiffs assert that a video recording of an interaction between Mr. Hernandez and Mr. Alesia "on or about" December 27, 2018 was disclosed to them in discovery (doc. # 82: Pls.' Resp. to Defs.' Mot., at 12; Am. Compl., ¶ 76). We assume that this interaction is different from the interaction that was captured on the December 26 videotape that no longer exists.

over which it has control and reasonably knows or could foresee would be material to" litigation. *Bryant v. Gardner*, 587 F. Supp. 2d 951, 967-68 (N.D. Ill. 2008); *see also Guzman v. Jones*, 804 F.3d 707, 713 (5th Cir. 2015) ("A party's duty to preserve evidence comes into being when the party has notice that the evidence is relevant to the litigation or should have known that the evidence may be relevant"). As soon as "a party first reasonably foresees that litigation is on the horizon, it is required to suspend its ordinary policies governing how information is retained or destroyed and put into place a litigation hold to preserve" all evidence discoverable under Federal Rule of Civil Procedure 26. *Oleksy v. Gen. Elec. Co.*, No. 06 C 1245, 2011 WL 3471016, at *2 (N.D. Ill. Aug. 8, 2011).

The missing December 26 videotape was discoverable and should have been preserved. Indeed, Mr. Alesia's attorney indicated that the videotape would have been part of his production required by the Mandatory Initial Discovery Pilot Project ("MIDP") if it had not been recorded over (doc. # 71-2: Pls.' Mot. Ex. 2, at 2), which evinces the video's potential relevance. *See* Am. MIDP Standing Order, ¶ B.3 (Dec. 1, 2018) (requiring the identification and/or production of documents that "may be relevant to any party's claims or defenses").[11]

We are also not persuaded by defendants' assertion that they had no duty to preserve the December 26 videotape because it "was not among the items specifically requested" for preservation by plaintiffs before it was overwritten (Defs.' Resp. at 6-7). "[A] party must preserve evidence that it has notice is reasonably likely to be the subject of a discovery request *even before a request is actually received.*" *Wiginton v. Ellis*, No. 02 C 6832, 2003 WL 22439865, at *4 (N.D. Ill. Oct. 27, 2003) (emphasis added); *see Bryant*, 587 F. Supp. 2d at 968 ("A formal discovery

---

[11] The Amended MIDP Standing Order is found at https://www.ilnd.uscourts.gov/_assets/_documents/MIDP%20Standing%20Order%20Dec0118.pdf and was last visited on November 8, 2019.

request is not necessary to trigger the duty to preserve evidence"). If we accepted defendants' assertion, a litigant could unabashedly destroy relevant documents so long as its opponent had not yet served discovery requests specifically seeking those documents or a letter requesting a litigation hold.

This is not the way federal litigation works. One way a party may determine what "is reasonably likely to be the subject of a discovery request" is by looking to the complaint. *See Wiginton*, 2003 WL 22439865, at *4. Plaintiffs' original complaint, filed November 17, 2018, named Mr. Alesia as a defendant and alleged that he violated plaintiffs' rights (doc. # 1: Compl., at ¶ 20 & Counts 1, 3, 4). From that point, at the latest, defendants were on notice that evidence pertaining to interactions between plaintiffs and Mr. Alesia should be preserved. More directly, though, defendants were on notice of an alleged December 2018 confrontation between Mr. Alesia and Mr. Hernandez as of January 7, 2019, when plaintiffs alleged that "on or about December 27, 2018, Defendant ALESIA approached HERNANDEZ at Department of Aviation ("DOA") premises and, again, confronted HERNANDEZ about dropping the lawsuit" (Am. Compl., ¶ 76). This gave defendants almost three weeks' notice before the December 26 videotape was overwritten, and we are unpersuaded by defendants' attempt to assign little consequence to this allegation on the basis that December 27, 2018 is an "entirely different date" (Defs.' Resp. at 7). The allegation says "on or about," *i.e.*, around December 27, 2018, and December 26 is around December 27. But even without the "on or about" qualifier, defendants should not have been limiting the scope of its evidence preservation efforts to the precise dates identified in plaintiffs' pleadings (if that is in fact what they were doing).

The two cases cited by defendants to support their assertion that they had no duty to preserve the December 26 videotape—*Schaefer* and *Olivarius v. Tharaldson Property*

*Management*, 695 F. Supp. 2d 824 (N.D. Ill. 2010)—do not lead us to a different conclusion. Notably, neither *Schaefer* nor *Olivarius* addressed a party's duty to preserve evidence in the course of federal litigation. Rather, both cases discussed this duty in an entirely different context: a stand-alone cause of action for negligent spoliation of evidence under Illinois law. *Schaefer*, 839 F.3d at 608-09; *Olivarius*, 695 F. Supp. 2d at 829-30. Put simply, *Schaefer* and *Olivarius* have no bearing on the issue we face here.

Furthermore, the lack of audio on the security videos does not mean the loss of the December 26 videotape was necessarily harmless. Even without audio, a viewer of the security video might see the expressions, actions, and gestures of the individuals captured on camera, and that evidence may support or rebut plaintiffs' allegations. Mr. Alesia's attorneys, for instance, found what they saw on video (presumably without audio) significant enough to assert that Mr. Hernandez's claim that he was threatened by Mr. Alesia was false (doc. # 82-3, at 3-5: 3/25/19 Ltr. from J. Rodriguez, at 2).

With all that said, disqualification is not warranted. Defendants' failure to preserve the December 26 videotape appears to be, at worst, negligence. *See Conner v. Rubin-Asch*, --- F. App'x ----, 2019 WL 5690626, at *3 (7th Cir. Nov. 4, 2019) (defendants' failure to preserve a video of the plaintiff inmate's cell extraction was, at most, negligence, where the defendants asserted without contradiction "that the video was written over (pursuant to normal practices) without first having been downloaded and saved"). Plaintiffs fail to cite any authority supporting the proposition that negligent spoliation rises to the "unlawful" destruction of evidence prohibited by Model Rule 3.4(a). And even if defendants' loss of the December 26 videotape somehow violated Rule 3.4(a), which we do not decide, other less severe remedies are available to plaintiffs. *See Guillen*, 956 F. Supp. at 1423-24 (finding disqualification unwarranted where less drastic remedies

were "available to solve any problems that might arise during the discovery process"); *see also Landmark Am. Ins. Co. v. Deerfield Constr., Inc.*, No. 15 C 1785, 2017 WL 157858, at *12 (N.D. Ill. Jan. 12, 2017) ("Even if there has been an ethical violation, disqualification does not automatically follow, but falls within the Court's discretion"). The loss of a single video is not the type of serious misstep that justifies depriving defendants of their choice of counsel.

## D.

Plaintiffs next assert that Corporation Counsel withheld evidence and, in doing so, violated Rules 1.3 and 3.4, as well as the court's MIDP Standing Order (Pls.' Mot. at 9-11). ABA Model Rule 1.3 requires a lawyer to "act with reasonable diligence and promptness in representing a client." Model Rules of Prof'l Conduct r. 1.3. ABA Model Rule 3.4 prohibits a lawyer from "unlawfully obstruct[ing] another party's access to evidence" and from "fail[ing] to make [a] reasonably diligent effort to comply with a legally proper discovery request by an opposing party." Model Rules of Prof'l Conduct r. 3.4(a), (d). Under the amended MIDP Standing Order, "[t]he duty of mandatory initial discovery . . . is a continuing duty," and when "new or additional information is discovered or revealed[,]" a party must serve supplemental responses addressing that information "in a timely manner, but in any event no later than 30 days after the information is discovered by or revealed to the party." Am. MIDP Standing Order, ¶ A.6.

We deny plaintiffs' motion to disqualify on this ground. At bottom, plaintiffs' argument is a complaint about the timeliness and content of defendants' document production. Such a complaint might warrant a motion to compel, which plaintiffs already brought and prevailed on (docs. ## 69, 77). Plaintiffs' complaint, however, does not justify attorney disqualification. Significantly, plaintiffs do not cite a single case that has invoked either Model Rule 1.3 or Model Rule 3.4 to disqualify counsel based on an alleged failure to produce relevant discovery in a timely

manner. Nor do plaintiffs cite a single case that supports disqualification as a remedy for an alleged violation of the court's MIDP Standing Order. To the contrary, if a party's failure to timely produce relevant discovery warranted disqualification, the motions to compel that courts already consider in almost every litigation would be replaced by motions for disqualification. This is not what is anticipated from a "drastic measure" that courts should impose only "when absolutely necessary." See *Freeman*, 689 F.2d at 721.

What is more, the bulk of plaintiffs' argument is directed to *Mr. Alesia*'s alleged five-plus month delay in producing emails that he purportedly had known about since February 10, 2019 (Pls.' Mot. at 9-10). Although Corporation Counsel represented Mr. Alesia at the beginning of this litigation, they stopped doing so on February 19, 2019 (docs. ## 18, 25-27). Thus, it was Mr. Alesia's new attorneys—not Corporation Counsel—who made the MIDP disclosures and document productions for Mr. Alesia until he was dismissed from this case in August 2019 (*see* Pls.' Mot. Ex. 2; docs. ## 43, 61). And it was Mr. Alesia's new attorneys—not Corporation Counsel—who did not produce purportedly "bombshell emails" until July 23, 2019 (doc. # 84: Pls.' Reply, at 3). Plaintiffs have not shown why the alleged untimeliness in Mr. Alesia's document production should be imputed to Corporation Counsel.

### E.

Plaintiffs also seek to disqualify Corporation Counsel because the City's OIG issued an investigatory subpoena to a bank seeking Mr. Hernandez's account statements from May 2017 through May 2019 ("the OIG Subpoena") (Pls.' Mot. at 11-13; doc. # 71-5: Pls.' Mot. Ex. 5). Plaintiffs contend that the City is "cheating" and "circumventing the discovery process by sending out" the OIG Subpoena "without giving notice to Plaintiffs or their counsels" (Pls.' Mot. at 11-12).

Plaintiffs have not shown that the OIG Subpoena warrants disqualifying Corporation Counsel. We start with the fact that there is no evidence that Corporation Counsel had anything to do with the issuance of the OIG Subpoena. In July 2019, Corporation Counsel represented that:

- the OIG Subpoena was not sent in coordination with Corporation Counsel's litigation efforts;

- its attorneys were not responsible for the OIG Subpoena's issuance;

- its attorneys are not privy to the details of OIG's ongoing investigations; and

- its attorneys do not possess the documents related to the OIG's investigation.

(doc. # 78-2, at 3-5: 7/24/19 Ltr. from S. Crouch to C. Casper, at 1-2). In their response, defendants also represent that Corporation Counsel did not know about the OIG Subpoena until after it issued (Defs.' Resp. at 11). Plaintiffs do not provide any evidence contradicting these assertions or any other basis to question them. Without evidence of coordination between the OIG and Corporation Counsel, we do not see any basis for holding Corporation Counsel responsible for the OIG's actions.

Furthermore, even if we assume that Corporation Counsel worked with the OIG on the OIG Subpoena in some capacity, plaintiffs have not explained why this would justify disqualification. Plaintiffs do not contend that the issuance of the OIG Subpoena violates any rule of professional conduct. Nor do plaintiffs challenge the OIG's authority to issue the OIG Subpoena or to seek the documents requested by the subpoena. In fact, plaintiffs say that Mr. Hernandez's "finances are discoverable" and that he "is willing to provide the information requested" (Pls.' Mot. at 13). Mr. Hernandez might prefer to produce this information only in the context of this lawsuit (*see id.*), but his preference does not make the OIG's actions improper. Mr. Hernandez can also (and under the MIDP, may be required to) produce his financial information in the context of this litigation even without a corresponding discovery request from the City.

We read plaintiffs' fundamental complaint to be that the OIG subpoenaed Mr. Hernandez's bank records without notifying Mr. Hernandez or his counsel beforehand (*see, e.g.*, Pls.' Mot. at 11, 13 (referring to the OIG Subpoena as a "secret investigation" and as an "underhanded subpoena[] for documents sent behind [Mr. Hernandez's] back with no notification")). Plaintiffs, in essence, want us to treat the OIG Subpoena like a document subpoena under Federal Rule of Civil Procedure 45, which requires the litigant issuing the subpoena to notify the other litigants before the subpoena is served. Fed. R. Civ. P. 45(a)(4). But the OIG's right to issue the OIG Subpoena does not derive from Rule 45. Instead, the OIG's subpoena power derives from the Municipal Code of Chicago, *see* Municipal Code of Chicago §§ 2-56-030(h), 2-56-040, and plaintiffs do not point to any aspect of the Municipal Code that requires pre-service notice. To the contrary, as stated on the OIG Subpoena itself, disclosing the existence of an investigatory subpoena "may jeopardize an ongoing investigation" (Pls.' Mot. Ex. 5 at 2). *See also S.E.C. v. Jerry T. O'Brien, Inc.*, 467 U.S. 735, 737, 750 (1984) (observing, in the context of SEC investigations into possible violations of the securities laws, that requiring the SEC to notify the "target" of an investigation when it has subpoenaed a third party "would substantially increase the ability of persons who have something to hide to impede" the investigation). Therefore, we see no reason why the OIG Subpoena would have to comply with Rule 45's notice requirement.

We might view the matter differently if the City had used the OIG Subpoena to obtain information for use in this litigation that it could not have otherwise obtained under the Federal Rules of Civil Procedure. That is what happened in *Securities and Exchange Commission v. Life Partners Holdings, Inc.*, No. 1:12-CV-00033-JRN, 2012 WL 12850253 (W.D. Tex. Aug. 17, 2012), cited by plaintiffs (Pls.' Mot. at 12-13).[12] In *Life Partners Holdings*, the plaintiff SEC

---

[12] Plaintiffs also cited two cases addressing requests under the Freedom of Information Act ("FOIA") (Pls.' Mot. at 13). These cases are inapposite, as FOIA has no applicability to the issues here.

deposed a third-party witness months before it was permitted to do so under the Federal Rules. 2012 WL 12850253, at *1, *3. The SEC argued that the deposition was not subject to the Federal Rules because it was taken under its regulatory authority to investigate potential violations of federal securities laws. *Id.* at *1-2. The court rejected this argument because "[t]he deposition was clearly intended to elicit testimony regarding allegations" made against the defendants in the litigation. *Id.* at *2-3.

In contrast, plaintiffs here concede that the financial information sought by the OIG in its investigation is "discoverable in this suit" (Pls.' Mot. at 13), which means it can be obtained by defendants under the Federal Rules. Moreover, there is no evidence that Corporation Counsel directed the issuance of the OIG Subpoena so that it could obtain documents for use in this litigation, or that Corporation Counsel intends to use any of the documents obtained pursuant to the OIG Subpoena for this case. The mere fact that the documents address an issue that may be relevant to both the OIG's investigation and this case—Mr. Hernandez's finances—does not, without more, suggest otherwise.

But let us assume that the OIG Subpoena was subject to Rule 45's notice requirement and that Corporation Counsel violated this requirement by failing to notify plaintiffs about the OIG Subpoena before it was served. According to plaintiffs' response to defendants' motion to disqualify, an alleged wrongdoing does not justify disqualification if there is no prejudice (*see* doc. # 82: Pls.' Resp. to Defs.' Mot., at 3). The bank notified Mr. Hernandez of the OIG Subpoena on May 10, 2019, three days after receiving it (Pls.' Mot. Ex. 5 at 1-2).[13] And the OIG Subpoena only sought documents (*id.* at 2), so the lack of pre-service notice did not deprive plaintiffs' counsel of

---

[13] It appears that Mr. Hernandez may not have informed his counsel about the OIG Subpoena until July 16, 2019, more than two months later (*see* doc. # 82-5, at 1-4: Pls.' Resp. to Defs.' Mot. Ex. 12). That delay is not attributable to defendants or their counsel.

the chance to cross-examine a witness or object to the witness's testimony, as was the case in *Life Partners Holdings*. *See* 2012 WL 12850253, at *3. Even if Corporation Counsel knew about the OIG Subpoena prior to its issuance (which Corporation Counsel denies) and had an obligation to notify plaintiffs about that subpoena before it went out, there was no prejudice from Corporation Counsel's failure to do so. *See Ello v. Brinton*, No. 2:14-CV-299-TLS-JEM, 2017 WL 56316, at *5 (N.D. Ind. Jan. 5, 2017) (where the defendants received notice of subpoenas five days after they were served and were able to object to the subpoenas, the plaintiffs' failure to notify the defendants of the subpoenas "was truly harmless"). The OIG Subpoena provides no basis to disqualify Corporation Counsel.

## F.

For the last argument in their opening motion, plaintiffs argue that Corporation Counsel have inherent conflicts of interest by representing both the City and the individual defendants (Messrs. Helm and Martin) (Pls.' Mot. at 13-14).[14] Although plaintiffs do not direct us to any applicable ethical rule, ABA Model Rule 1.7 generally prohibits a lawyer from representing a client "if the representation involves a concurrent conflict of interest." Model Rules of Prof'l Conduct r. 1.7(a).[15] When an attorney simultaneously represents "parties whose interests in litigation may conflict," *e.g.*, co-defendants, a concurrent conflict of interest is defined as "a significant risk that the representation of one or more clients will be materially limited by the

---

[14] After plaintiffs filed their motion, the City retained separate counsel to represent Mr. Helm in this litigation. Corporation Counsel currently only represent the City and Mr. Martin (*see* docs. ## 18, 53, 89, 93).

[15] Notwithstanding a concurrent conflict of interest, a lawyer may still represent a client if "(1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client; (2) the representation is not prohibited by law; (3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and (4) each affected client gives informed consent, confirmed in writing." Model Rules of Prof'l Conduct r. 1.7(b); *see also id.*, cmt. [23] ("[C]ommon representation of persons having similar interests in civil litigation is proper if the requirements of paragraph (b) are met"). Defendants, though, do not argue that these requirements have been met.

lawyer's responsibilities to another client[.]" Model Rules of Prof'l Conduct r. 1.7(a)(2) & cmt. [23]. "A conflict may exist by reason of substantial discrepancy in the parties' testimony, incompatibility in positions in relation to an opposing party or the fact that there are substantially different possibilities of settlement of the claims or liabilities in question." *Id.*, cmt. [23]. The party seeking disqualification must provide "solid evidence to support an allegation of conflict." *Dahleh*, 2018 WL 1167675, at *1 (internal quotations omitted).

Plaintiffs contend that a disqualifying conflict exists because the City may be able to avoid liability by arguing that the individual defendants' conduct was *outside* the scope of their employment, which would directly undermine any argument by the individual defendants that their actions are immune from liability because they were undertaken *within* the scope of their employment (Pls.' Mot. at 13-14). As evidence of this purported conflict, plaintiffs point to certain of the affirmative defenses asserted by the City and the individual defendants (*Id.* at 14). The City asserts that it is not liable for (1) any injury caused by an employee's oral promise or misrepresentation; (2) any injury caused by an employee's libelous or slanderous action; or (3) "the provision of information either orally, in writing, by computer or any other electronic transmission" (doc. # 32: City's Answer, at 49 ¶¶ 5-6). Messrs. Martin and Helm, on the other hand, assert that they work in positions "involving the exercise of discretion" and that they are "not liable for any injury resulting from [their] act[s] or omission[s] in determining policy when acting in the exercise of such discretion" (doc. # 28: Martin's Answer, at 53 ¶ 3; doc. # 31: Helm's Answer at 48 ¶ 3). According to plaintiffs, these "defenses cannot be effectively advocated for by the same attorneys on behalf of the City" and the individual defendants (Pls.' Mot. at 14). Defendants respond that plaintiffs merely present a hypothetical conflict of interest, rather than the actual conflict of interest that must be shown to warrant disqualification (Defs.' Resp. at 11).

Although the Seventh Circuit has "remained sensitive" to the potential for conflicts of interest where the same attorneys represent a municipality and its employees in lawsuits that invoke 42 U.S.C. § 1983, it has rejected the notion that a disqualifying conflict automatically "results when a governmental entity and one of its employees are sued jointly under section 1983." *See Ross*, 910 F.2d at 1425, 1431-32; *Coleman v. Smith*, 814 F.2d 1142, 1147-48 (7th Cir. 1987). Furthermore, in *Philips Medical Systems International B.V. v. Bruetman*, 8 F.3d 600 (7th Cir. 1993), the Seventh Circuit indicated that an *actual* conflict must be shown before disqualifying an attorney based on dual representation. In that case, two attorneys were representing both the individual defendant and the individual's corporations, which were also defendants. *Id.* at 602, 605-06. When the district court discovered this, it disqualified the attorneys because it was concerned that the individual defendant and his corporations might have adverse interests. *Id.* at 606. The *Philips Medical Systems* court recognized that this was a valid concern, but it found the disqualification improper because the district court never determined that there was an actual conflict of interest between the individual and his corporations. *Id.*

We, like other courts in this district, thus conclude that a party seeking to disqualify the other party's attorney must demonstrate more than the possibility of a conflict of interest—it must establish an actual conflict of interest. *See, e.g., Fematt v. City of Chicago*, No. 11 CV 1530, 2012 WL 1681990, at *2 (N.D. Ill. May 9, 2012) (citing *Philips Med. Sys.*, 8 F.3d at 606); *Breneisen v. Motorola, Inc.*, No. 02 C 50509, 2003 WL 1699641, at *1 (N.D. Ill. Mar. 28, 2003) (refusing to disqualify attorneys who were representing both a corporate defendant and the defendant's employees where there was no actual conflict of interest); *Cruz v. Cty. of DuPage*, No. 96 C 7170, 1997 WL 370194, at *4 (N.D. Ill. June 27, 1997) ("[C]ounsel should not be disqualified unless there is a substantial basis for believing that *actual*, rather than merely potential, conflicts of

interest are afoot") (emphasis in original; internal quotations omitted); *Clay v. Doherty*, 608 F. Supp. 295, 303 (N.D. Ill. 1985) ("Vague and general inconsistencies of position giving rise to hypothetical conflicts in the mind of an opposing party will not justify so drastic a measure as disqualification").

*Cruz* is particularly instructive. There, the plaintiffs filed civil rights lawsuits against DuPage County and current and former officers and employees of the county. *Cruz*, 1997 WL 370194, at *1. Both the county and the individual defendants (current or former county officers and employees) were represented by the county's attorneys. *Id.* at *4. The chairman of the county board sought to intervene and disqualify the county's attorneys based on this dual representation because, according to the chairman, the individual defendants would likely argue they were acting in their official capacities or within the scope of their employment, and such an argument conflicted with the county's interest in asserting that the individuals' acts were outside the scope of their employment. *Id.* The *Cruz* court rejected this argument and found disqualification unwarranted because the chairman failed to show any actual conflict between the county and the individual defendants by, for instance, showing that the individual defendants were in fact acting outside the scope of their employment or that the county was asserting as much. *Id.* at *4-5.

The same can be said here. Even if the individual defendants' "policy and discretion" defense is comparable to a "within the scope of employment" defense, plaintiffs have not shown that the City claims to be immune from liability because these individuals' actions were outside the scope of their employment or their discretion. At best, plaintiffs have shown that the City is claiming immunity for particular employee actions—oral promises and misrepresentations, libelous or slanderous actions, and the provision of information—regardless of whether they were performed within the employees' scope of employment. Moreover, plaintiffs do not identify any

instance in this litigation where Corporation Counsel has advanced a position that helps the City but hurts either of the individual defendants (or vice versa), whether in the context of motion practice, discovery, or otherwise.

Of course, Corporation Counsel should ensure that their clients are fully informed of the risks that may accompany the representation of co-defendants. As this litigation proceeds, Corporation Counsel should be vigilant for any developments that create "a significant risk" that its representation of one client will "materially limit[]" its responsibilities to its other client. Model Rules of Prof'l Conduct r. 1.7(a)(2). But it would be unwarranted to entertain the drastic remedy of disqualification unless such a conflict materializes.

### G.

In their reply brief, plaintiffs raise an additional issue, which pertains to discovery from a third party, Mr. Thome. According to plaintiffs, the City agreed as part of an ESI / Rule 37 conference in June 2019 to search and turn over documents in Mr. Thome's possession (Pls.' Reply at 1). On October 2, 2019, however, Corporation Counsel informed plaintiffs' counsel that the City's position was that it did not possess or control "non-party Nick Thome's personal cell phone and email accounts" (*Id.* at 1-2; *Id.*, Ex. 1 at 2). Plaintiffs take issue with this position, given the purported June 2019 agreement and defendants' reliance on text message evidence from Mr. Thome to support their motion to disqualify plaintiffs' counsel (Pls.' Reply at 2-4; *see* Thome Decl. & Exs.). Specifically, plaintiffs contend that the City's position amounts to the withholding of evidence (Pls.' Reply at 1).

Plaintiffs once again fail to explain why Corporation Counsel's actions warrant the drastic remedy of attorney disqualification. A litigant cannot withhold evidence that is not within its possession, custody, or control. *See* 7 Moore's Fed. Practice – Civil § 34.14[2][a] (2019) ("[A]

party may not be compelled to produce items that are not within either its possession, its custody, or its control"). Putting the purported June 2019 agreement to one side for the moment, plaintiffs do not point to anything suggesting that Mr. Thome's personal cell phone and email accounts are in the City's possession, custody, or control. True, defendants relied upon text message evidence provided by Mr. Thome to support their motion to disqualify. But this does not mean that they possess or otherwise control all of Mr. Thome's other text messages and, notably, it does not say anything about the defendants' access to or control over Mr. Thome's personal email accounts.

Moreover, plaintiffs do not cite any rule or case law that supports turning defendants' acquisition of certain text message evidence from Mr. Thome into an affirmative obligation to make him search for and provide other relevant text messages. Indeed, plaintiffs have obtained evidence from Mr. Thome for use in this litigation as well, including what they call "one of the most bombshell texts [sic] messages in this case" (Pls.' Reply at 2; doc. # 82-1: Casper Decl., ¶¶ 6, 10 (declaring that Mr. Thome has provided plaintiffs with text messages, emails, handwritten notes, and photographs of Cubs tickets)). Yet plaintiffs do not explain why they cannot just as easily have Mr. Thome produce the text messages that they fault defendants for failing to produce.

Nor do plaintiffs identify any procedural or ethical rule that obligates Corporation Counsel to ask Mr. Thome about other texts he may have or to question his motives for providing evidence to defendants (*see* Pls.' Reply at 2). Plaintiffs can speak with Mr. Thome and ask these questions, or they can subpoena Mr. Thome for documents and deposition testimony to discover this information. Defendants are not required to conduct this discovery for plaintiffs.

Nonetheless, there might be circumstances where a litigant agrees to search for and produce responsive and relevant documents that are in the possession of a third party. If the litigant does so, it should not be permitted to produce only the relevant and responsive documents it deems

helpful and then claim that other, less helpful documents are not within its possession, custody, or control. That is what plaintiffs essentially accuse the City of doing in light of its purported agreement to search and turn over documents in Mr. Thome's possession.

We would expect such an agreement to be reflected in emails or letters around the time of the June 2019 ESI / Rule 37 conference, but plaintiffs do not direct us to any such documentation. For the sake of argument, though, let us assume that (1) the City agreed in June 2019 to search for and produce documents in Mr. Thome's possession, including those in his personal cell phone and email accounts; and (2) the City, by later asserting that these accounts were not within its possession or control, reneged on this agreement. Even with these assumptions, plaintiffs do not explain why these actions could not be adequately addressed by a discovery motion. As with their contentions regarding the untimely production of documents and the issuance of the OIG subpoena, plaintiffs are improperly seeking to use disqualification to remedy discovery issues that can be addressed by other means.

### III.

In sum, plaintiffs have not shown that Corporation Counsel's alleged ethical and discovery violations, independently or taken together, justify disqualification.[16] With that said, we close with the following additional observations.

Plaintiffs' motion to disqualify Corporation Counsel strikes us as an improper tit-for-tat response to defendants' motion to disqualify plaintiffs' own counsel. Despite identifying conduct that has allegedly occurred for several months, plaintiffs did not bring this motion until after defendants filed their motion to disqualify. Plaintiffs' lead attorney acknowledges that the motion came "on the heels of the City's own efforts to disqualify" him, but he contends that he only

---

[16] Although we have addressed plaintiffs' various arguments separately, we have also considered whether Corporation Counsel's complained-of conduct, as a whole, warrants disqualification. We find that it does not.

became aware of a basis to disqualify Corporation Counsel while preparing his response to defendants' motion (Pls.' Mot. at 2). We are skeptical that an attorney who has practiced law for approximately 10 years, as has plaintiffs' attorney (*see* Pls.' Resp. to Defs.' Mot. at 13), would realize that "repeated, ongoing, continuous, and incessant ethical infractions" could lead to disqualification (*see* Pls.' Mot. at 2) only after his opponent sought his disqualification. But even accepting this contention is problematic, as it suggests that plaintiffs' attorney does not firmly grasp the scope of an attorney's ethical duties.

Allegations of ethical misconduct, especially ones involving witness intimidation and contacting represented parties, are serious matters that should be supported by tangible evidence. They should not be leveled based on speculation or frustration with other aspects of litigation. Unfortunately, that appears to be what plaintiffs did here.

At the same time, defendants' attempt to downplay the meme described in plaintiffs' supplemental filing by describing it as harassing in quotation marks is not well-taken (Defs.' Resp. at 4). We imagine that Corporation Counsel and their former and current individual clients would not take kindly to the circulation of flyers around their offices that questioned their integrity and honesty, as the meme at issue does with respect to Mr. Hernandez.

Furthermore, many of plaintiffs' allegations about the conduct of their co-workers, if true, reflect actions that have no place in the workplace and in the context of this litigation. Although Corporation Counsel asserts that it has already spoken with the individual defendants about many of these allegations (*see* Defs.' Resp. at 3-4), it would be wise for them to reiterate to their clients the inappropriateness of any actions that might be read as attempts to intimidate plaintiffs or their counsel, and to explain that such actions do nothing to advance this litigation.

## CONCLUSION

For the foregoing reasons, we deny plaintiffs' motion to disqualify Corporation Counsel (doc. # 71).

ENTER:

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**DATE: November 12, 2019**