**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| HECTOR HERNANDEZ and CHARLES TERMINI, individually, and on behalf of all others similarly-situated, | |
| Plaintiffs, | No. 18-cv-07647 |
| | Judge Franklin U. Valderrama |
| v. | |
| JAMIE RHEE, *et al.*, | |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

Hector Hernandez (Hernandez) and Charles Termini (Termini) (collectively, Plaintiffs) are motor truck drivers (MTDs) for the City of Chicago Department of Aviation (DOA), assigned to O'Hare Airport (O'Hare). They filed this suit against the City of Chicago (the City), William Helm, Deputy Commissioner at O'Hare, in his individual capacity (Helm), and numerous other defendants[1] (collectively, Defendants), alleging that they suffered political discrimination and retaliation related to overtime distribution, job assignments, and vehicle assignments as a result of their refusal to engage in certain political activities. R. 13, Am. Compl.[2]

---

[1] The amended complaint also named as defendants Jamie Rhee, Commissioner of the DOA, in her official capacity (Rhee), Joseph Alesia, Airport Manager at O'Hare, in his individual capacity (Alesia), and Kevin Martin, another Airport Manager at O'Hare, in his individual capacity (Martin). These defendants have been dismissed.

[2] Citations to the docket are indicated by "R." followed by the docket number or filing name, and where necessary, a page or paragraph citation.

Before the Court are the City's Motion for Summary Judgment (R. 127, City MSJ) and Helm's Motion for Summary Judgment (R. 130, Helm MSJ) pursuant to Federal Rule of Civil Procedure 56. For the reasons set forth below, the Court grants both motions.

## Background[3]

The following undisputed facts are set forth as favorably to Plaintiffs, the non-movants, as the record and Local Rule 56.1 permit. *Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012). On summary judgment, the Court assumes the truth of those facts, but does not vouch for them. *Arroyo v. Volvo Grp. N. Am., LLC*, 805 F.3d 278, 281 (7th Cir. 2015).

### A. Roles

Hernandez has been a MTD for the DOA at O'Hare since October 1999. Pls.' Resp. DSOF ¶ 1.[4] Termini has been a MTD for the DOA at O'Hare since July 1993. *Id.* ¶ 2. At O'Hare, MTDs escort construction personnel to projects, remove snow, and monitor emergencies involving the runways or taxiways. *Id.* ¶ 3.

Helm was a Deputy Commissioner of Vehicle Services at the DOA from February 4, 2014 to August 15, 2019, whose duties included overseeing Vehicle Services' operations to ensure that work was done properly and safely. Pls.' Resp.

---

[3]The Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1346(b).

[4]Citations to the parties' Local Rule 56.1 Statements of Material Facts are identified as follows: "DSOF" for Defendants' Statement of Material Facts (R. 129); "Pls.' Resp. DSOF" for Plaintiffs' Amended Response to Defendants' Statement of Material Facts (R. 179 at 1–38); "PSOF" for Plaintiff's Statement of Additional Material Facts (R. 179 at 38–49); and "Defs.' Resp. PSOF" for Defendants' Response to Plaintiff's Statement of Additional Material Facts (R. 180).

DSOF ¶ 4. Martin began his employment with the City on November 9, 1995 as a MTD. *Id.* ¶ 6. He was a MTD Foreman from April 2014 to July 2017, during which time he was responsible for assigning MTDs to different job and equipment posts. *Id.* ¶¶ 6–7; *see also* Defs.' Resp. PSOF ¶ 12.[5] MTD Foremen supervise MTDs daily, assign tasks to them, keep track of hours and overtime worked, and assign vehicles to them for their use. Pls.' Resp. DSOF ¶ 8. Martin became an Airport Manager for Vehicle Services in July 2017, and his duties include overseeing the day-to-day operations at O'Hare, overseeing the training section, coordinating training section assignments, and holding meetings with members of the training section. *Id.* ¶ 10. Additionally, he oversees all MTD Foremen. *Id.* Eric Sanders (Sanders), who was in charge of equipment, and Alesia, who was responsible for discipline and projects around the building, also served as Airport Managers along with Martin during the relevant time period. *Id.* ¶ 11.

During Martin's time as a MTD Foreman, he acted as one of Plaintiffs' seven immediate supervisors, but the parties dispute whether he supervised Plaintiffs while serving as an Airport Manager. Pls.' Resp. DSOF ¶ 7. The chain of command is as follows: MTD Foreman report to the Airport Managers; the Airport Managers, including Martin, reported directly to Helm; Helm reported to George Lyman, Managing Deputy Commissioner (Lyman); and above Lyman, a Chief Operating Officer (unnamed) reported directly to the Commissioner of Aviation. *Id.* ¶ 12.

---

[5]Defendants repeatedly object to Plaintiffs' Rule 56.1 statements as 'vague,' when, in fact, they are supported by specific evidence in the record. The Court considers the facts presented by the respective parties to the extent they are supported by record evidence and are not argumentative.

Teamsters Local 700 (the Union) is the union which represents all DOA MTDs, including Plaintiffs, pursuant to the Teamsters Local 700 Collective Bargaining Agreement (the CBA). Pls.' Resp. DSOF ¶ 13. Hernandez has held multiple paid positions with the Union, including assistant business agent and also business agent. *Id.* ¶ 14. Additionally, he was elected President of the Chicago Teamsters Hispanic Caucus. *Id.*

### B. MTD's, Overtime, and Vehicles

MTD Foremen are responsible for assigning and tracking overtime at Vehicle Services. Pls.' Resp. DSOF ¶ 16. When they need to call in MTDs for overtime, they are supposed to call the most senior MTD on the roster who has had the fewest hours of overtime opportunities; once an MTD is offered overtime, every other MTD has to have been offered the same number of overtime hours before that same MTD is called again for overtime. If one MTD says "yes" to each overtime opportunity but another MTD says "no" to each overtime opportunity, both MTDs would still have equal numbers of overtime opportunities on their roster. The parties disagree as to whether this procedure for overtime opportunities was followed during the relevant time period. *Id.* The CBA also provides that overtime be offered "first to the employee performing the job [requiring overtime] and thereafter by seniority to the most senior employee in the job classification at the work location being given the opportunity to work provided the employee has the present ability to perform the work to the satisfaction of the Employer without further training." *Id.* ¶ 17.

Hernandez earned the following amounts of overtime from 2012 through 2018: 2012 - $6,729.00; 2013 - $8,289.14; 2014 - $14,202.06; 2015 - $10,051.53; 2016 - $10,860.00; 2017 - $12,704.00; and 2018 - $15,653.00. Pls.' Resp. DSOF ¶ 21. Hernandez earned more overtime after Helm started working at the DOA in 2014 than he had earned the two years prior to Helm's arrival. *Id.* In 2016, he took a voluntary leave of absence for four and a half months (from April 17 through August 31), during which time he was ineligible to earn overtime. *Id.* ¶ 22. Additionally, in terms of overtime, 2019 was Hernandez's "best year yet." *Id.* ¶ 21. Nevertheless, Hernandez testified that Helm's "political guys" were earning more overtime than others, and he identified 41 MTDs who he claims earned more overtime than him due to politics. *Id.* ¶ 23. For example, in 2015, Tomasz Dorosz earned $37,518.64 in overtime and William Remos earned $10,118.42 in overtime, while Hernandez only earned $10,051.53 in overtime. Defs.' Resp. PSOF ¶¶ 7–8.

Hernandez testified that he lost overtime in 2016 as a result of being skipped over on a call list. Pls.' Resp. DSOF ¶ 24. While Hernandez claims that Helm was behind MTD Foremen forgetting to call him for overtime, he never heard Helm instruct anyone to skip him for overtime or instruct an MTD Foreman to manipulate the overtime list. *Id.* Termini testified that he and Locelso had many conversations about the fact that there was an understanding that Helm's insiders, (or "political guys"), were to be taken care of and that if there was a good job out there, they were to get it first. R. 129-3, Termini Dep. at 267:15–268:16. Termini is not aware of losing any overtime since filing this lawsuit in November 2018, and he earned more

overtime from 2014 through 2016 under Helm than he had previously earned before Helm. Pls.' Resp. DSOF ¶ 28.

MTD Foremen assign vehicles, such as pick-up trucks, snow equipment, and duty vehicles to MTDs based on assignments year-round. Pls.' Resp. DSOF ¶ 29. While Martin testified that MTD Foremen have assigned the same pick-up truck, a 2016 Ford F250, to Hernandez for the past two winter seasons (2018-2019 and 2019-2020), Hernandez has not provided any testimony regarding this vehicle assignment. *Id.*; *see generally* R. 129-2, Hernandez Dep. Termini testified he was given preferential treatment, including receiving overtime and "way better vehicles" starting in 2014 when he became part of a political organization. Termini Dep. at 184:11–185:3. This preferential treatment lasted three years through most of 2016. *Id.* 185:19–23; *see also* Pls.' Resp. DSOF ¶ 32.

MTDs' assignments can change daily based on the DOA's operational needs, and MTD Foremen give out daily work assignments through a dispatch office, including assignment changes and overtime distribution. Pls.' Resp. DSOF ¶ 33. The CBA does not guarantee MTDs any particular assignments. *Id.* ¶ 38. At the beginning of the winter season (October through April or May), MTDs can request to be Lead MTDs of different snow and ice removal teams. *Id.* ¶¶ 34–35. Lead MTDs supervise a crew of 20 or 25 truck drivers. *Id.* ¶ 36. Lead MTDs earn more overtime in the snow seasons because they get called in first before any other drivers to lead the snow teams. Defs.' Resp. PSOF ¶¶ 10, 21. After MTDs submit a preference form indicating whether they want the MTD Foremen to consider them for a Lead assignment, MTD

Foremen then assign them to snow and ice removal teams. Pls.' Resp. DSOF ¶ 34. MTD Foreman have discretion in changing Lead assignments based on operational need, and "[a]dding or removing an MTD from a Lead assignment comes from an MTD Foreman's recommendation after a consensus is reached among all MTD Foremen on the respective shift and then brought to management's attention." *Id.* ¶ 37.

As of October 2019, every year that Hernandez had requested to work as a Lead MTD, including under Helm, he received a Lead MTD position with pay differential. Pls.' Resp. DSOF ¶ 39. As a Lead MTD, he earned more than $1.50 per hour extra as compared to non-Lead MTDs. *Id.* During the first fifteen winter seasons he worked as a Lead MTD, he was one of multiple "broom 9 team" Lead MTDs. *Id.* ¶ 40. However, shortly after Helm started in February 2014, Helm removed Hernandez from this team. *Id.* Hernandez admitted that one Lead MTD assignment was not better than another. *Id.* ¶ 41. Hernandez was assigned to lead a different team each year starting with the 2014-2015 winter season but had the same assignment for the 2018-2019 and 2019-2020 winter seasons. *Id.* ¶ 42. Even though Hernandez's Lead assignments changed immediately after Helm started at the DOA in February 2014, this was nine months before Helm asked him to do any political work. *Id.* ¶ 43. Hernandez believed these reassignments in early 2014 were due to political favoritism. *Id.*

Termini first became a Lead MTD in November 1995 and worked as a Lead every winter until the 2017 winter, when he no longer wished to be a Lead MTD. Pls.'

Resp. DSOF ¶ 46. Even though Termini was offered Lead MTD positions after he stopped doing political work, he declined. *Id.* ¶ 47. Termini began assisting in the training section in 2004 but left the training section in September 2016. *Id.* ¶ 54. The parties dispute the nature of his departure. While Defendants claim he "left the training program" (DSOF ¶ 54), Plaintiffs dispute this. Termini testified that Alesia removed him from the training section/program. Termini Dep. at 128:8–129:4. Termini claims that Lisa Ellermann, a co-worker, told him that while he had previously been out of the office, they had been approached by Helm to remove him because he was not "playing well with others." *Id.* at 129:13–132:10.

### C. Political Activities

Prior to Helm's arrival at the DOA, Hernandez had canvassed for and collected petition signatures for various Democratic candidates. Pls.' Resp. DSOF ¶ 60. In his role as president of the Chicago Teamsters Hispanic Caucus for the past ten years, he campaigned for at least one alderman and two state senators. *Id.* ¶ 61. Termini started volunteering in politics in the late 1980's to increase his chances of getting a job. *Id.* ¶ 69. Termini's volunteering continued through 1996 with his DOA co-workers, one of whom helped Termini get his job with the City. *Id.*

Helm was a precinct captain for an alderman from approximately 2011 to 2018. Pls.' Resp. DSOF ¶ 57. He asked Plaintiffs to perform political work, such as attending meetings, canvassing, getting petition signatures, and donating to political campaigns. *Id.* ¶ 58; *see also* Defs.' Resp. PSOF ¶ 14. On or around November 12, 2014, Hernandez, at Helm's request, attended his first political meeting. Pls.' Resp.

DSOF ¶ 62; *see also* Defs.' Resp. PSOF ¶ 14. Hernandez attended three or four political functions at Helm's request, with the last event on February 4, 2015. Pls.' Resp. DSOF ¶ 63. These included precinct and captain meetings, and volunteer meetings. *Id.* ¶ 65. Helm asked Hernandez to get money from the Union for political candidates, and Hernandez never refused. *Id.* ¶ 64. Hernandez also testified that Helm harassed him to get money from the Union for political candidates, but Defendants dispute whether any "harassment" took place. Defs.' Resp. PSOF ¶ 2. The Union leadership decided whether to provide the money Helm requested, yet each time Hernandez passed Helm's request to the Union, the Union gave Hernandez money. Pls.' Resp. DSOF ¶ 64. Hernandez acted an intermediary between the Union and Helm's preferred Democratic candidates. *Id.* ¶ 65.

Hernandez complied with all of Helm's requests because he feared that he would lose overtime and other benefits. Pls.' Resp. DSOF ¶ 65. He believed in November 2014 that if he did not perform the political work Helm requested him to do, it would adversely impact his position, his overtime, his vehicle, and "all that kind of stuff." *Id.* ¶ 66. However, he first refused to perform political work in November 2014, and as a result, he claims he lost overtime, was reassigned to a new Lead position, and was provided less desirable equipment. *Id.* He also refused to assist Helm with political work for the 2015 Chicago mayoral and alderman elections, and the 2016 Democratic Ward Committeeman election. *Id.* He also stopped canvassing for political candidates for Helm because he got so angry with Helm for making him work in politics. Defs.' Resp. PSOF ¶ 1.

From August 2014 through March 2016, at Helm's request, Termini volunteered for aldermen campaigns and a mayoral election. Pls.' Resp. DSOF ¶ 69. He stopped engaging in political business at Helm's request during the summer of 2016. *Id.* ¶ 70. Termini does not allege he was subjected to political discrimination. *Id.* ¶ 68.

### D. Office of Inspector General

Pursuant to the City's Office of Inspector General (OIG) Ordinance, City employees have a duty to cooperate with the OIG. Pls.' Resp. DSOF ¶ 94. Hernandez spoke with the OIG in January, April, and August 2018. *Id.* ¶ 74. In January 2018, Hernandez had an interview with the OIG, at which he discussed political favoritism, such as overtime and assignments, for MTDs in the training program who performed work for politicians Helm supported. *Id.* ¶ 75. Specifically, he complained about Helm's requests that Hernandez procure money for Alderman Pat O'Connor's political campaign. Defs.' Resp. PSOF ¶ 3. On April 24, 2018, he also spoke to the OIG via telephone regarding his removal from the training program and a lack of overtime opportunities as retaliation for going before the OIG in January. Pls.' Resp. DSOF ¶ 76. In August 2018, he spoke to the OIG about favoritism shown to other MTDs through overtime in exchange for engaging in political activity. *Id.* ¶ 77.

Termini also communicated with the OIG in 2018. In August 2018, the OIG commanded him to appear at its offices, and he was told that he was the subject of an investigation related to political activity on duty and falsifying time. Pls.' Resp. DSOF ¶ 78. On November 13, 2018, he sent an email to the OIG complaining of retaliation

and harassment as a result of his speaking to the OIG in August about political favoritism. *Id.* ¶ 80. On December 11, 2018, he emailed the OIG again to complain that the Union held a meeting at the DOA that discussed and discredited this case. *Id.* ¶ 81. Termini did not believe Helm was aware that Termini was communicating with the OIG through email after his August 2018 interview with the OIG. *Id.* ¶ 83. When asked whether Helm ever retaliated against him for cooperating with the OIG in August 2018, Termini testified that Helm had retaliated against him—"every day he worked religiously to have [Termini] disciplined and/or removed." Termini Dep. at 222:17–223:5. When asked if Helm did anything other than trying to have Termini disciplined or have him removed, Termini answered no. *Id.* at 223:7–10.

### E. Discipline

In February 2019, during a meeting, Hernandez said, "fuck this" and walked out as soon as Helm entered and before the meeting was done. Pls.' Resp. DSOF ¶ 95. Two MTD Foremen heard him say the expletive, and as a result, Airport Manager Sanders issued Hernandez a two-day suspension. *Id.* On October 4, 2018, Termini, sent an anonymous "No Confidence" letter via a fake email address he created to airlines and DOA management expressing "no confidence" in DOA management, specifically naming Helm, Martin, and Alesia in the letter. *Id.* ¶ 96. The letter had nothing to do with politics or Helm's request that Termini or anyone else engage in politics. *Id.* ¶ 101. On the same date, he was caught on video handing out unspecified papers or literature at work, and management gathered a to/from report (dated October 13, 2018) from MTD Foremen regarding this incident. *Id.* ¶ 97; Termini Dep.

at 237:24–238:10. Helm, Martin, and Alesia met with representatives from the DOA Human Resources department to discuss potential discipline for Termini's infractions. *Id.* ¶ 98. Alesia issued three notices of discipline for various actions: a five-day discipline for insubordination for disrupting a September 18, 2018 safety standards meeting "by yelling and publicly challenging management's decisions on safety vests, speeding and uniforms and then walking out of the meeting;" a ten-day discipline for distributing the "No Confidence" letter to his co-workers during work time; and a fifteen-day discipline for saying "bring it on pussy" on a two-way radio. *Id.* ¶ 99. Termini never served any suspensions and did not lose any pay either. *Id.* ¶ 102.

### F. Union Meeting and Letter

Pursuant to the CBA, the Union has a right to access the DOA premises. Pls.' Resp. DSOF ¶ 103. It also has the right "to bulletin board space at locations where they can be conveniently seen and read by affected employees" and to post notices concerning its business on the bulletin boards. *Id.* ¶ 104. At some point after this lawsuit was filed, the Union posted a letter on its bulletin board at the DOA. *Id.* ¶ 105; Hernandez Dep. 327:6–8. The letter was about the lawsuit, and according to Hernandez, was a "very demeaning, terrible letter." Hernandez Dep. 326:15–22. Martin did not see the letter until some point later, and Helm did not have any conversations with Union executives asking them to take a position on the lawsuit. Pls.' Resp. DSOF ¶ 105.

### G. Alleged Retaliation

Hernandez claims he suffered numerous adverse actions because he refused to engage in political work or because he communicated with the OIG. Pls.' Resp. DSOF ¶ 106. He claims he received fewer overtime opportunities from 2014 to the present. *Id.* But, his overtime since he met with the OIG has not dropped. *Id.* ¶ 111. While he alleges he had his Lead assignments changed from one to another from February 2014 through October 2017 (*id.* ¶ 106), he did not change Lead positions after he cooperated with the OIG (*id.* ¶ 111). He alleges that a meme was circulated at the DOA which depicted him holding an Academy Award while he cried during an interview he had given to Channel 2 News on December 11, 2018. *Id;* Hernandez Dep. at 332:12–14. But he admitted that he never witnessed Helm or Martin distributing the meme. Pls.' Resp. DSOF ¶ 107. While he alleges that Helm's associate threatened him in December 2018 (*id.* ¶ 106), he admits that neither Helm nor Martin threatened him (*id.* ¶ 108). Though he alleges his co-workers teased him in December 2018 and January 2019 (*id.* ¶ 106), he admits that neither Helm nor Martin teased him. (*id.* ¶¶ 108–09).

Termini testified that Helm has retaliated against him by using Nick Thome as a mouthpiece for months to send messages to him to drop this lawsuit and end the investigation. Pls.' Resp. DSOF ¶ 115. However, Helm has not retaliated against him in any other way and has not spoken to him directly since filing the lawsuit. *Id.* ¶¶ 117–18. Hernandez admitted that Helm did not retaliate against him after filing this complaint. *Id.* ¶ 116.

## Standard of Review

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Vill. of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." FED. R. CIV. P. 56(c)(2).

## Analysis

On November 17, 2018, Plaintiffs filed a complaint against Defendants, which has since been amended. *See* Am. Compl. Plaintiffs' amended complaint asserts the following causes of action against Defendants:

14

| Count No. | Plaintiff(s) | Cause of Action | Defendant(s) | Amended Complaint Paragraph Nos. |
|---|---|---|---|---|
| Count I | Hernandez | 42 USC § 1983 First Amendment Deprivation by Political Retaliation/ Discrimination | Helm | ¶¶ 133–50 |
| Count II | Hernandez | 42 USC § 1983 Deprivation of First Amendment Right to Freedom of Speech | The City | ¶¶ 151–63 |
| Count III | Plaintiffs | 42 USC § 1983 Deprivation of First Amendment Rights to be Free from Retaliation[6] | Helm | ¶¶ 164–71 |
| Count IV | Plaintiffs | Violation of the Illinois' Whistleblower Act for Disclosures and Refusals | The City and Helm | ¶¶ 172–84 |
| Count V | Plaintiffs | Deprivation of First Amendment Speech and Petition Rights based on Post-Complaint Retaliation | Helm | ¶¶ 185–94 |
| Count VI | Plaintiffs | Illinois Whistleblower Act Claim for Post-Complaint Retaliation | The City and Helm | ¶¶ 195–201 |
| Count VII | Plaintiffs | Indemnification | The City | ¶¶ 202–03 |

Plaintiffs' claims fall into three categories: Section 1983/First Amendment claims; Illinois Whistleblower Act (IWA) claims; and an indemnification claim. The crux of Plaintiffs' claims concern whether Defendants awarded overtime

---

[6]This case was originally pending before Judge Lee and was transferred to this Court on September 28, 2020. R. 142. Judge Lee previously dismissed Plaintiffs' Fourteenth Amendment claims under Counts III and Count V. R. 101.

opportunities and vehicle and equipment assignments based on MTDS' political activities, and whether Defendants retaliated against Plaintiffs based on their refusal to engage in certain political activities by depriving them of overtime opportunities and preferential vehicle and equipment assignments. In addition to asserting statute of limitations defenses to the Section 1983 and IWA claims, Defendants argue that summary judgment should be entered in their favor because Plaintiffs have failed to present sufficient evidence to prove their claims, and that certain conduct on the part of Defendants does not fit into the required parameters to warrant liability.

Before addressing the substance of the motions, the Court must address a preliminary matter. The City argues that Plaintiffs' Amended Response to Defendants' Statement of Material Facts violates Local Rule 56.1 because many of Plaintiffs' responses "do not controvert, or even address, Defendants' facts." R. 174, City Reply at 1. As such, the City contends that these specific facts should be deemed admitted. *Id.* Additionally, the City asserts that certain of Plaintiffs' responses and Plaintiffs' additional facts are inadmissible because they are either conclusory and immaterial, based on hearsay, or based entirely on speculation and guesswork. *Id.* at 2.

Local Rule 56.1 requires the moving party to file a statement of facts that demonstrates its entitlement to judgment as a matter of law. *Petty v. City of Chi.*, 754 F.3d 416, 420 (7th Cir. 2014). The nonmoving party then must file a response to that statement and may provide a separate statement of additional facts. *Id;* N.D. Ill. Local R. 56.1(b)(3). "Each response must admit the asserted fact, dispute the asserted

fact, or admit in part and dispute in part the asserted fact." N.D. Ill. Local R. 56.1 (e)(2). Further, "[t]o dispute an asserted fact, a party must cite specific evidentiary material that controverts the fact and must concisely explain how the cited material controverts the asserted fact. Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material." N.D. Ill. Local R. 56.1 (e)(3). "When a responding party's statement fails to dispute the facts set forth in the moving party's statement in the manner dictated by the rule, those facts are deemed admitted for purposes of the motion." *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 632 (7th Cir. 2009).

District courts have discretion to enforce strict compliance with Local Rule 56.1's requirements. *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 219 (7th Cir. 2015); *see also Hanover Ins. Co. v. House Call Physicians of Ill.*, 2016 WL 1588507, at *2 (N.D. Ill. Apr. 19, 2016) (collecting cases). Therefore, to the extent Plaintiffs fail to properly dispute any of Defendants' asserted facts, the Court will deem those facts admitted. Where any such facts are material to the Court's analysis, the Court notes them within this Opinion. Furthermore, the Court will not consider Plaintiffs' asserted facts "not supported by deposition testimony, documents, affidavits or other evidence admissible for summary judgment purposes." *Brown v. Target Corp.*, 2013 WL 5737344, at *1 (N.D. Ill. Oct. 22, 2013).

Having addressed this preliminary Rule 56 matter, the Court now turns to Defendants' motions for summary judgment. The Court begins with Plaintiffs' Section 1983/First Amendment claims.

## I.     Section 1983/First Amendment Claims

The First Amendment protects political belief and association, and the "right to associate with the political party of one's choice is an integral part of this basic constitutional freedom." *Elrod v. Burns*, 427 U.S. 347, 357 (1976) (internal quotations and citations omitted). It "prohibits discrimination against public employees based on the employees' political association." *Bisluk v. Hamer*, 800 F.3d 928, 933 (7th Cir. 2015) (citing *Elrod*, 427 U.S. at 356). It also "generally prohibits government officials from dismissing or demoting an employee because of the employee's engagement in constitutionally protected political activity." *Yahnke v. Kane Cnty.*, 823 F.3d 1066, 1070 (7th Cir. 2016) (quoting *Heffernan v. City of Paterson*, 136 S.Ct. 1412, 1416 (2016)).

Plaintiffs assert four Section 1983/First Amendment claims against Defendants. In Count I, Hernandez alleges that as a result of his refusal to do political work for the Democratic Party both on and off work time, he was deprived of overtime, preferred equipment, preferred assignments, and equal treatment that he otherwise would have received. Additionally, he was deprived of his First Amendment rights and privileges to be free from engaging in political work. Am. Compl. ¶¶ 133–50. In Count II, Hernandez alleges that the City had widespread policies, customs, practice, and acts regarding distribution of overtime, equipment, trucks, and assignments, and because Plaintiffs refused to comply with practices requiring them to engage in political activities, they suffered adverse actions. *Id.* ¶¶ 151–63. In Count III, Plaintiffs allege that because of their cooperation with the OIG investigation into

political favoritism and discrimination, Helm and other individuals retaliated against Plaintiffs, and they suffered actual harm and emotional distress. *Id.* ¶¶ 164–71. Finally, in Count V, Plaintiffs allege that since initiating this lawsuit, they were deprived of their First Amendment right to speak on matters of public concern and their First Amendment right to petition their government for redress. *Id.* ¶¶ 185–94.

Defendants move for summary judgment on all three counts for various reasons. As an initial matter, Defendants argue that some of the alleged actions Hernandez experienced are time-barred by the statute of limitations. R. 128, City Memo. at 4; R. 131, Helm Memo. at 12–13. The City also maintains that Hernandez's First Amendment claim against it (Count II) fails on the merits because the evidence of Hernandez's "refusals" is weak; he did not suffer an actionable deprivation; there was no causal connection between the alleged adverse actions and his protected activity; and there is no basis for City liability under *Monell*. City Memo. at 4–12.

Helm also contends that all the 1983 and First Amendment claims against him (Counts I, III, and V) fail as a matter of law because Plaintiffs cannot prove a constitutional injury; Plaintiffs were not denied overtime; and Plaintiffs' statements to the OIG are not constitutionally protected. Helm Memo. at 7–11. He then argues that Plaintiffs cannot show that Helm improperly deprived them of overtime or otherwise retaliated against them because Helm is not involved in assigning overtime, Helm did not retaliate after Plaintiffs cooperated with the OIG, and Helm did not retaliate after Plaintiffs initiated this lawsuit. *Id.* at 14–16.

19

The Court addresses Defendants' statute of limitations arguments first before addressing their remaining arguments.

## A. Statute of Limitations

For a statute of limitations defense, "summary judgment is only appropriate if (1) the statute of limitations has run, thereby barring plaintiff's claim as a matter of law, and (2) there exist no genuine issues of material fact regarding the time at which plaintiff's claim has accrued and the application of the statute to the plaintiff's claim which may be resolved in plaintiff's favor." *Yorger v. Pittsburgh Corning Corp.*, 733 F.2d 1215, 1219 (7th Cir. 1984). Plaintiffs filed their original complaint on November 17, 2018. R. 1., Compl. Defendants argue that a two-year statute of applies and bars Hernandez's claims to the extent any of them are based on actions that occurred before November 17, 2016. City. Memo. at 4; Helm Memo. at 12–13. The City asserts that the applicable statute of limitations is two years, because Section 1983 borrows the statute of limitations for analogous personal-injury claims in the forum state. In Illinois, that period is two years. *See* City Memo. at 4 (citing *Lewis v. City of Chi.*, 914 F.3d 472, 478 (7th Cir. 2019)). Next, the City argues that because federal law determines when a claim accrues, such a claim accrues when the plaintiff "knows or should know that his or her constitutional rights have been violated." *Id.* (quoting *Janus v. Am. Fed'n of State, Cnty. & Mun. Emp., Council 31; AFL-CIO*, 942 F.3d 352, 361 (7th Cir. 2019)). According to the City, Hernandez testified that as far back as November 2014, he believed that if he did not perform the political work Helm requested him to do, it would adversely impact his job. City Memo. at 4. Accordingly,

his political discrimination claim accrued in 2014, and any claims based on actions before November 17, 2016 are barred. *Id.*

Helm argues that he is entitled to summary judgment on the political retaliation claim against him because Hernandez's allegations about mistreatment he suffered in 2018 do not involve Helm. Helm Memo. at 13.

Plaintiffs respond that Hernandez is not making claims for adverse actions suffered prior to November 17, 2016. R. 167-1, Resp. at 2–3. Yet, confusingly and without citation to any legal authority, they also claim that all the adverse actions going back through 2014 *are* actionable. *Id.* The Court disagrees. To start, Plaintiffs' failure to respond to the City's argument in any meaningful way results in waiver. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver."). No matter, because it cannot be disputed that Hernandez learned of any alleged adverse actions against him as early as November 2014, and that his Section 1983 claims began to accrue then. *See*, 942 F.3d at 361. The statute of limitations for Section 1983 claims is indeed two years. *See Lewis*, 914 F.3d at 478. Based on the fact that Plaintiffs initiated this lawsuit on November 17, 2018, to the extent Hernandez, or for that matter, Termini, is making any Section 1983/First Amendment claims for actions suffered prior to November 17, 2016, those claims are time-barred. The Court, however, declines to grant summary judgment as to Helm on Hernandez's political retaliation claim as a whole on a statute of limitations basis because certain facts point to Helm's actions after November 17, 2016.

21

### B. Political Discrimination/Retaliation

Turning now to the merits-based arguments, Plaintiffs' Section 1983 claims are claims for either political discrimination based on their refusal to perform certain political activities or political retaliation they suffered as a result of the refusal. As a general matter, Section 1983 provides "a cause of action against a person, who, acting under the color of state law, *deprives* any individual of a right, privilege, or immunity secured by the Constitution and laws of the United States." *Lanahan v. Cnty. of Cook*, 2018 WL 1784139, at *4 (N.D. Ill. Apr. 13, 2018) (emphasis added) (citing *L.P. v. Marian Cath. High Sch.*, 852 F.3d 690, 696 (7th Cir. 2017)).

"To establish a *prima facie* claim of First Amendment political discrimination, a plaintiff must show: (1) that the plaintiff's conduct is constitutionally protected; and (2) that the protected conduct was a motivating factor in the employer's actions." *Daza v. Ind.*, 941 F.3d 303, 308 (7th Cir. 2019) (citing *Bisluk*, 800 F.3d at 933). "To show that protected conduct was a motivating factor in the employer's action, a plaintiff must demonstrate a causal connection between the conduct and the employer's action." *Id.* (citing *Graber v. Clarke*, 763 F.3d 888, 889 (7th Cir. 2014)).

"To establish a *prima facie* political retaliation claim, plaintiffs must present evidence that: (1) they engaged in constitutionally protected conduct; (2) they suffered a deprivation likely to deter such conduct in the future; and (3) their conduct was the but-for cause of the deprivation." *Brown v. Cnty. of Cook*, 804 F. Supp. 2d 722, 727 (N.D. Ill. 2011) (citing *Delapaz v. Richardson*, 634 F.3d 895, 900 (7th Cir. 2011)).

The parties do not dispute that Plaintiffs have a First Amendment right to refuse to engage in political activity (each claim's first element). The dispute turns on the other elements of these claims.

### i. "Weak" Evidence

The City first contends that "the evidence of Hernandez' refusals is weak." City Memo. at 5–6. This argument is a non-starter because at summary judgment, a court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder. Rather, the court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Johnson v. Advoc. Health and Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018) (quoting *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003)). As such, the Court will not entertain a credibility argument in deciding the City's motion.

### ii. Deprivations

Deprivation is a specific element required for a political retaliation claim. *See Brown*, 804 F. Supp. 2d at 727. While deprivation is not a specific element of a political discrimination claim under *Daza* (941 F.3d at 308), for any Section 1983 First Amendment claim, there must be a deprivation "of a right, privilege, or immunity secured by the Constitution and laws of the United States." *Lanahan*, 2018 WL 1784139, at *4; *see also Klinger v. City of Chi.*, 2017 WL 736895, at *8 (N.D. Ill. Feb. 24, 2017) (the analysis for a constitutional claim under Section 1983 "begins by identifying the specific constitutional right allegedly infringed") (quoting *Graham v.*

*Connor*, 490 U.S. 386, 394 (1989)). Accordingly, the Court must first determine whether Plaintiffs suffered any deprivations.

Defendants argue that they are entitled to summary judgment on Counts I, II, III, and V because Plaintiffs did not suffer actionable deprivations. The City argues that Hernandez did not suffer actionable deprivations based on his overtime opportunities, his job assignments, and his vehicle assignments, and therefore, there was no First Amendment violation. City Memo. at 6–8. Helm makes a similar argument regarding both Plaintiffs' lack of overtime deprivation. Helm Memo. at 9–10.

Helm also makes an additional, threshold argument—that Plaintiffs' claims of lack of access to preferred vehicles and favorable assignments do not implicate their constitutional rights and therefore cannot constitute actionable deprivations. Helm Memo. at 8. Again, Plaintiffs fail to respond to this argument in any meaningful way, resulting in waiver. *See Bonte*, 624 F.3d at 466. Moreover, Plaintiffs have not put forth any authority showing that they are entitled to preferred vehicles or favorable assignments. Notwithstanding this failure, the Court evaluates each of the alleged three categories of deprivations.

First, Defendants assert that the evidence reveals that Hernandez gained, instead of lost, overtime after Helm started working at O'Hare, and, as such he was not deprived of any overtime because of refusal to participate in political activity. City Memo. at 6–7; Helm Memo. at 9–10. Helm also claims that there is no basis to conclude that Termini was deprived of overtime. Helm Memo. at 10. The City

distinguishes between overtime itself and overtime opportunities because when MTD Foremen need to call in MTDs for overtime, they call the most senior MTD who has had the fewest hours of overtime opportunities. City Memo. at 6. If a MTD says "yes" every time and another MTD says "no" every time, then they would still have an equal number of overtime opportunities but their overtime earnings could be different. *Id.*

Beginning with overtime, the City notes that Hernandez earned more overtime during Helm's time at the DOA than he did the two years before Helm began working at the DOA. City Memo. at 7. For example, in 2016, he earned more overtime (taking his voluntary leave of absence into account) than he did before Helm began working at the DOA. *Id.* (citing DSOF ¶¶ 21, 22). Helm adds that the evidence shows Hernandez earned nearly double the amount of overtime in 2017 and 2018 than he did in 2012 and 2013, before Helm started working at the DOA. Helm Memo. at 9. Even though Hernandez identified 41 MTDs who he claims earned more overtime than him due to politics, the City contends that he has not shown that they earned more due to politics and that there are also an additional 100 MTDs who earned more than him without any connection to politics. City Memo. at 7. For Termini, Helm points to Termini's admission that he did not lose any overtime as a result of filing the complaint and that he never lost overtime based on his refusal to participate in politics at any time. Helm Memo. at 10.

Plaintiffs do not challenge Defendants' assertion that Hernandez earned more overtime after Helm began working at the DOA. Instead, Plaintiffs respond that the overtime distribution itself is skewed in favor of political workers, and even though

25

Hernandez earned more in overtime in certain years, he would have made more in overtime before 2018 absent preferential treatment for political workers. Resp. at 5–6. They contend that the CBA provides a procedure for distributing overtime on an equalized basis via seniority (a fact that Defendants dispute) and suggest that the CBA contemplates some sort of overtime equalization. Instead, Plaintiffs assert that the overtime records reflect a $27,000.00 disparity between Hernandez, and the top MTD overtime earner, Tomasz Dorosz. *Id.* Hernandez speculates that he lost overtime which he would have received if political favoritism had not occurred. *Id.*

As an initial matter, it is undisputed that Defendants have shown that there is no genuine dispute of fact that Termini did not lose overtime. Plaintiffs fail to attempt to show any genuine dispute of fact related to Termini's earned overtime, instead ignoring this issue altogether their Response, resulting in a waiver. *See* Reply at 5–6 (citing *Bonte*, 624 F.3d at 466).

Moving to Hernandez, Defendants have proffered evidence showing that Hernandez earned more overtime after Helm began working at the DOA, specifically after Hernandez refused Helm's request to perform political activities. Hernandez's refusals ran from November 2014 through 2016. *See* Pls.' Resp. DSOF ¶ 66. Hernandez first refused to perform political work in November 2014 (Pls.' Resp. DSOF ¶ 66), but the Court can only consider evidence after November 17, 2016, due to the statute of limitations. *See supra* at Section 1.A. Even though Defendants do not break down the amount of overtime Hernandez earned in 2016 based on this date, Hernandez only could have earned overtime from January 1, 2016 through April 16,

2017 and then from September 1, 2016 through December 31, 2016, taking into account his leave of absence. *See* Pls.' Resp. DSOF ¶ 22. For seven and a half months of 2016, he earned $10,860.00 in overtime, which is more than any year between 2012-2015. *Id.* ¶ 21. In 2017, he earned $12,704.00 in overtime, which is more than any year from 2012-2016. In 2018, he earned $15,653.00 in overtime, which is more than any year from 2012-2017. *Id.* And, in terms of overtime, 2019 was Hernandez's "best year yet." *Id.* The evidence shows that from 2017 through 2019, not only did Hernandez's earned overtime increase each year, but also it was more than in each of the years before or during Hernandez's refusals to perform political work.

The burden then shifts to Plaintiffs to present evidence showing a genuine issue of material fact regarding Hernandez's alleged overtime deprivation. But Plaintiffs fail. The Court agrees with Helm that Hernandez has not presented any evidence relating to distribution of overtime after November 17, 2016 as it involves allocation of overtime to him as opposed to other MTDs. Helm Reply at 5. Accordingly, Plaintiffs fail to show any direct evidence showing overtime deprivation.

Plaintiffs instead ask the Court to draw inferences and connect dots to conclude there is a genuine dispute of fact. But, "[s]ummary judgment requires only that all reasonable inferences be drawn in favor of the non-moving party . . . An inference is not reasonable if it is directly contradicted by direct evidence provided at the summary judgment stage, nor is a 'conceivable' inference necessarily reasonable at summary judgment." *MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins. Co.*,

994 F.3d 869, 876 (7th Cir. 2021). None of the inferences Plaintiffs ask the Court to make are reasonable in light of Defendants' direct evidence.

For example, Plaintiffs repeatedly point to evidence showing more than 46 MTDs in the highest overtime earning categories who Hernandez personally witnessed attend political events at Helm's request, including overtime records reflecting a $27,000.00 disparity between Hernandez, and the top MTD overtime earner, Tomasz Dorosz. Resp. at 5 (citing PSOF ¶¶ 6–8). Yet this circumstantial evidence relates to overtime from 2015, before the November 17, 2016 cut-off date, and the Court cannot consider it.

In another section of their Response, Plaintiffs reference Hernandez's testimony that he observed at least 46 MTDs at political events, whose attendance Helm requested, and that these MTDs were at the top of the overtime lists in 2015, 2016, 2017, and 2018. Resp. at 8 (citing PSOF ¶¶ 6–7). But this evidence, similar to the above-referenced evidence, points to earnings in 2015 only, and the Court cannot consider it. Even if Plaintiffs' evidence shows that 46 MTDs that Hernandez observed attending political events at Helm's request were at the top of the overtime lists after November 17, 2016, and it does not, Plaintiffs invite the Court to make an unreasonable inference that, on the one hand, the other 46 MTDs earned more overtime because of their agreeing to Helm's directive to engage in political activities, and, on the other hand, that Hernandez was deprived of overtime because of his refusal. No evidence suggests that these 46 MTDs were at the top of the overtime lists because they agreed to attend political events. Moreover, though Plaintiffs

highlight the CBA and the fact that it provides that overtime is supposed to be distributed equitably based on seniority (Resp. at 8), Plaintiffs do not show how these 46 MTDs were similarly situated to Hernandez based on seniority or in any other respect—in other words, that Hernandez and these 46 MTDs should have received the same overtime because they received the same overtime opportunities and said "yes" every time. *See* City Memo. at 6. Plaintiffs also fail to present evidence that Helm even pressured each of these 46 MTDs to attend political events, thereby resulting in their earning more overtime than Hernandez based on his refusal. Finally, Plaintiffs say nothing about the approximately 100 MTDs who also earned more overtime than Hernandez, who he did not identify as "political people", ignoring yet another variable that further weakens their attempt to suggest an inference. *See* City Memo. at 7.

In viewing the facts and drawing reasonable inferences in the light most favorable to Plaintiffs, as the Court must, *Scott*, 550 U.S. at 378, the evidence shows that Hernandez earned more overtime after Helm's arrival at the DOA than prior to Helm's tenure, and that Hernandez continued to receive overtime after he refused to engage in political activities at Helm's request. Simply put, Plaintiffs ask the Court to make a leap that cannot land.

Looking at overtime *opportunities*, Plaintiffs also fail to show that Hernandez could have earned more overtime after Helm arrived at the DOA but for political favoritism or that he was deprived overtime opportunities based on his refusal to perform political work for Helm. As the City points out in its Reply, Plaintiffs have

presented no evidence that Hernandez was offered fewer overtime *opportunities* than other MTDs. City Reply at 2 (emphasis added). The Court finds that the City has met its burden that there is no genuine dispute that Plaintiffs were deprived of overtime opportunities or overtime, and that Plaintiffs have failed to proffer any evidence of that raises a genuine issue of material fact.

Second, the City argues that Hernandez did not receive materially adverse job assignments. City Memo. at 7–8. It points to the fact that as of October 2019, Hernandez had been assigned as a Lead MTD for more than 20 years and that every year he requested to work as a Lead MTD, including those years under Helm, he received a Lead MTD position. *Id.* His admission that different Lead MTD assignments were not better than others and that his preference was not to be reassigned do not reveal adverse assignments. *Id.* at 8.

Plaintiffs counter that Hernandez did not testify that one Lead MTD assignment is not better than another. Resp. at 6. Not so, as Hernandez specifically admitted that one Lead MTD assignment was not better than another. Pls.' Resp. DSOF ¶ 41. Plaintiffs also claim that Hernandez testified that some Lead MTD spots were better than others, such as the Broom 9 Lead team, but this statement does not appear in Defendants' Statement of Facts, as Plaintiffs suggest. Resp. at 6–7. Similarly, Plaintiffs also assert that Termini testified that a particular Lead assignment "may be tied to more or less overtime," but again, this statement does not appear in Plaintiffs' Statement of Facts. *Id.* at 7.

Plaintiffs' reliance on *Spalding v. City of Chi.*, 24 F. Supp. 3d 765, 780 (N.D. Ill. 2014) does not help them. *See* Resp. at 7. The case involved a motion to dismiss, not a motion for summary judgment. *Spalding*, 24 F. Supp. 3d at 773. The court held that the plaintiff police officers' allegations of removal from one Chicago Police Department unit and transfer to a less desirable unit were sufficient to support a First Amendment relation claim. *Id.* at 780–81. In doing so, the court affirmed the undisputed principle that the First Amendment prohibits "facilitating the transfer of public employees to less desirable positions because of their involvement in uncovering government misconduct." *Id.* at 781. But that is not the case here because Hernandez admitted that one Lead MTD assignment was not better than another (Pls.' Resp. DSOF ¶ 41) and that he still received Lead MTD assignments during Helm's tenure (*id.* ¶ 39). Accordingly, the Court finds that the City has met its burden of showing no genuine dispute that changes to Hernandez's job assignments were not materially adverse, and that Plaintiffs have failed to put forth evidence that raises a genuine issue of material fact.

Third, the City maintains that changes to Hernandez's vehicle assignments are not materially adverse. City Memo. at 8. Plaintiffs offer no response to this argument again and have waived it. *See Bonte*, 624 F.3d at 466. Accordingly, the Court finds that the City has met its burden of showing no genuine dispute that changes to Hernandez's vehicle assignments were not materially adverse, and that Plaintiffs have failed to put forth evidence that raises a genuine issue of material fact.

In viewing the facts and drawing reasonable inferences in the light most favorable to Plaintiffs, as the Court must, *Scott*, 550 U.S. at 378, the Court finds that the alleged acts against Plaintiffs are not materially adverse, and therefore Plaintiffs did not suffer an actionable deprivation. While the Court could end its analysis here (*see Howard v. U.S. Postal Serv.*, 1995 WL 138966, at *3 (N.D. Ill. Mar. 24, 1995); *see also Neutral Tandem, Inc. v. Peerless Network, LLC*, 2010 WL 5071191, at *3 (N.D. Ill. Dec. 2, 2010)), the Court will also review the additional arguments Defendants raise in favor of summary judgment.

### iii.    Causal Connection

Defendants next argue that Plaintiffs have failed to show a causal connection between the alleged adverse actions and the protected activity. City Memo. at 8–9; Helm Memo. at 14–16. A causal connection is necessary to succeed on a First Amendment political discrimination or retaliation claim. *Osterlin v. Cook Cnty. Sheriff's Dep't*, 781 Fed. Appx. 517, 521 (7th Cir. 2019). A plaintiff "must show that a violation of his First Amendment rights was a motivating factor of the harm he's complaining of." *Milliman v. Cnty. of McHenry*, 893 F.3d 422, 430 (7th Cir. 2018) (internal quotations omitted). After a plaintiff makes this showing, then the burden shifts to the defendant "to show that the harm would have occurred anyway." *Id.* (same). "Once a defendant produces evidence that the same decision would have been made in the absence of the protected speech, the burden shifts back to the plaintiff to demonstrate that the proffered reason was pretextual and that the real reason was retaliatory animus." *Id.* (same). At summary judgment, "this means a plaintiff must

produce evidence upon which a rational finder of fact could infer that the defendant's proffered reason is a lie." *Id.* (same).

The City first asserts that both Plaintiffs testified that they only had speculation to implicate Helm or Martin in overtime manipulation. City Memo. at 8 (citing DSOF ¶ 25). While the evidence advanced by Plaintiffs supports this point, Plaintiffs dispute this assertion. Plaintiffs note that Hernandez testified that multiple foremen told him that Helm was instructing them to manipulate overtime. Pls.' Resp. DSOF ¶ 25. Hernandez testified that he heard Locelso, an MTD Foreman, say that Helm manipulated the overtime list. Hernandez Dep. at 201:4–18. Termini testified that he and Locelso had many conversations about the fact that there was an understanding that Helm's insiders, or political guys, were to be taken care of and that if there was a good job out there, they were to get it first. Termini Dep. at 267:15–268:16. The City points out in its Reply that such conversations constitute inadmissible hearsay. City Reply at 6 (citing *Bordelon v. Bd. of Educ. of the City of Chi.*, 811 F.3d 984, 991–92 (7th Cir. 2016)). The Court agrees and also notes that Plaintiffs never requested leave of the Court to file a surresponse to contest this objection. Since Plaintiffs advance this evidence for the truth of the matter asserted, mainly that Helm was directing overtime manipulation, this evidence constitutes inadmissible hearsay. *See Egan v. Freedom Bank*, 2012 WL 12996187, at *1 (N.D. Ill. June 5, 2012) ("Hearsay means a statement that the declarant does not make while testifying at the current trial and that a party offers in evidence to prove the truth of

the matter asserted in the statement.") (citing FED. R. EVID. 801(c)). Accordingly, the Court cannot consider this evidence.

Helm also argues that he had no involvement in assigning overtime. Helm Memo. at 14. He points to Hernandez's admission that he never saw Helm instruct the MTD Foremen in charge of assigning overtime to manipulate the overtime list. *Id.* The Court agrees that Plaintiffs have not presented any evidence that Helm was responsible for assigning overtime.

Plaintiffs respond to the City's overtime argument by referencing Hernandez's testimony that he observed at least 46 MTDs at political events, whose attendance Helm requested, and that these MTDs were at the top of the overtime lists in 2015, 2016, 2017, and 2018. Resp. at 8 (citing PSOF ¶¶ 6–7). They also highlight testimony from Hernandez in which he states that he started receiving less overtime compared to other MTDs after he stopped performing political work for Helm and after he complained to a DOA official and the OIG about it. *Id.* Plaintiffs' evidence related to the 46 MTDs points to 2015 only, which is before November 17, 2016 cut-off date. And Hernandez's statements, without more, do not show any causation between Hernandez's refusal and his alleged overtime deprivation or create a dispute of material fact regarding such causation.

Next, the City argues that even though Hernandez alleges in the complaint that Helm, Martin, and Alesia deprived him of preferred assignments and vehicles for refusing to perform political work, he later admits that MTD Foremen, not deputy commissioners or airport managers, assign MTDs to different jobs. City Memo. at 9

34

(citing DSOF ¶ 8). Similarly, MTD Foremen are responsible for assignment vehicles. City Memo. at 9 (citing DSOF ¶¶ 8, 29). As such, the City asserts that there is no connection between job and vehicle assignments and Plaintiffs' treatment. City Memo. at 9. The City also points to the fact that Hernandez testified that his Lead assignments changed immediately after Helm started at the DOA in February 2014, nine months before Helm asked him to perform any political work. *Id.* The Court disregards this statement, however, because it occurred before the November 17, 2016 cut-off date.

Plaintiffs counter that Helm was aware of Hernandez's "political bent" because he asked Hernandez to assist with Democratic functions and candidates. Resp. at 8. Plaintiffs also reference a text chain between Helm and Hernandez in which Helm promises to take care of "Juanita", but again, this does nothing to show a connection between Helm and how he or anyone else treated Hernandez. *Id.* They also reference a January 29, 2015 e-mail from Helm to Hernandez regarding assignments and transfers, but this email was sent before the November 17, 2016 cut-off date. *Id.* Plaintiffs also cite to several statements from other MTDs that allegedly show Helm's power to influence assignments and transfers. *Id.* Yet, none of this evidence specifically implicates Hernandez's treatment, including the overtime opportunities he received, the assignments he received, or the vehicles he received. Even if, as Plaintiffs posit, Helm has more authority than he or the City suggests, Plaintiffs still have not satisfied their burden to prove that Hernandez's refusal to engage in Helm's political work was the motivating factor or cause of his alleged political

discrimination or retaliation. *See Daza*, 941 F.3d at 308; *Brown*, 804 F. Supp. 2d at 727; *Milliman*, 893 F.3d at 430.

Helm also argues that he did not retaliate in response to Plaintiffs' cooperation with the OIG and their filing of this lawsuit. Helm Memo. at 14–16. He asserts that Termini cannot sustain his Section 1983 claim against Helm because he received his discipline in 2018 from others and never served his suspensions. *Id.* at 15. Plaintiffs again do not respond to this argument, but the evidence nonetheless supports Helm's position. Termini did not serve his suspension and did not lose any pay either. Pls.' Resp. DSOF ¶ 102.

Helm claims that Hernandez cannot point to any retaliation by Helm as a result of Hernandez's cooperation with the OIG. Helm Memo. at 15. He argues that Hernandez's lead position did not change, his overtime did not drop, and others (not Helm) belittled Hernandez. *Id.* Plaintiffs present no reasoned response to this argument. No matter, as the evidence again supports Helm' contention. Hernandez admitted that he never witnessed Helm distributing the Academy Award crying meme (Pls.' Resp. DSOF ¶ 107); he never heard Helm use derogatory language towards him (*id.* ¶ 108); and all the belittling in December 2018 and January 2019 came from others, not Helm (*id.* ¶ 108–09). Hernandez also did not change Lead positions after he cooperated with the OIG, and his overtime has not dropped since he met with the OIG. *Id.* ¶ 111.

Helm makes the same argument regarding any alleged retaliation against Plaintiffs after they filed this lawsuit. Helm Memo. at 16. He maintains that even

though Termini stated that Helm used Thome as a mouthpiece to send Plaintiffs messages to drop the lawsuit, there is no evidence that Helm directed Thome to say anything to Plaintiffs regarding the lawsuit. *Id.* Moreover, he claims that Hernandez admitted that Helm did not retaliate against him after filing the complaint. *Id.* (citing DSOF ¶ 116). The Court agrees with Helm. Other than Termini's testimony that Helm used Thome as a mouthpiece for months to send messages to him to drop this lawsuit, he has offered no other evidence that Thome acted under Helm's control or influence. *See* Pls.' Resp. DSOF ¶ 115. Termini admitted that Helm has not retaliated against him in any other way and has not spoken to him directly since filing the lawsuit. *Id.* ¶¶ 117–18. Also, Hernandez admitted that Helm did not retaliate against him after filing the complaint. *Id.* ¶ 116.

As such, because Plaintiffs have failed to satisfy their burden to show that any alleged violation of their First Amendment rights was a motivating factor of alleged political discrimination or retaliation, the Court finds no causal connection between Plaintiffs' alleged injuries and any political discrimination or retaliation. Again, while the Court could end its analysis here (*see Howard*, 1995 WL 138966, at *3; *see also Neutral Tandem, Inc.*, 2010 WL 5071191, at *3), the Court will also review the remaining arguments Defendants raise in favor of summary judgment.

## iv. Constitutionally Protected Statements Related to OIG Investigation

In Count III, Plaintiffs allege that Helm, Alesia, and Martin caused a campaign of bullying, intimidation, segregation, discrimination, and belittling of Plaintiffs as a result of their cooperation with the OIG investigations into political favoritism and

discrimination among MTDs at O'Hare, thereby depriving Plaintiffs of their First Amendment rights to be free from retaliation. Am. Compl. ¶¶ 166–67. In Count V, Plaintiffs allege that, as a result of, among other things, their reporting unlawful actions to and cooperating with the OIG, Helm, Alesia, and Martin deprived them of their First Amendment rights to petition their government for redress of grievances and to speak on matters of public concern as private citizens. *Id.* ¶¶ 188–91.

Helm argues that Plaintiffs' statements to the OIG are not constitutionally protected and accordingly, the entirety of their Count III and the portion of their Count V based on political retaliation fails, citing *Garcetti v. Caballos*, 547 U.S. 410, 422 (2006) and *Milsap v. City of Chi.*, 2018 WL 3361889, at *1 (N.D. Ill. July 10, 2018) (*Milsap II*). Helm Memo. at 10–11.

"For a public employee's speech to be protected under the First Amendment, the employee must show that (1) he made the speech as a private citizen, (2) the speech addressed a matter of public concern, and (3) his interest in expressing that speech was not outweighed by the state's interests as an employer in promoting effective and efficient public service." *Swetlik v. Crawford*, 738 F.3d 818, 825 (7th Cir. 2013) (internal quotation marks omitted). Under the second element, "whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement." *Kubiak v. City of Chi.*, 810 F.3d 476, 482–83 (7th Cir. 2016). Specifically, "when analyzing the content of the speech, the broad subject matter is not determinative," and a court "must instead focus on the particular content of the speech." *Id.* at 483 (internal citations omitted). Under the

third element, "if an employer takes action against an employee for speech that the employer, based on an adequate investigation, reasonably believes to be false, the employer's interests outweigh the speaker's interests." *Swetlik*, 738 F.3d at 825.

Plaintiffs do not respond to Helm's argument in their Response. No matter, as the Court finds Helm's arguments with respect to the OIG statements unpersuasive.

Helm argues that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Helm Memo. at 10 (quoting *Garcetti*, 547 U.S. 410 at 422). In *Garcetti*, the plaintiff was a deputy district attorney who prepared a memorandum in which he recommended dismissal of a case based on alleged governmental misconduct. 547 U.S. at 410. He filed a Section 1983 complaint against the county and his supervisors at the district attorney's office and alleged that he was subject to adverse employment actions in retaliation for his memorandum. *Id.* The district court granted the defendants' motion summary judgment, the Ninth Circuit reversed and remanded, and the Supreme Court then reversed. *Id.* The Supreme Court found that in preparing a memorandum on whether to prosecute a pending case, Garcetti was clearly acting pursuant to his official duties as a deputy district attorney that in practice, included supervising attorneys, investigating charges, and preparing filings. *Id.* at 422. As such, the attorney's statements were not protected against discipline under the First Amendment. Here, Helm insists that Plaintiffs had a "duty to cooperate" with the OIG, as a condition of their employment. Helm Memo. at 10

(citing Pls.' Resp. DSOF ¶ 94). Though Helm fails to connect the dots to *Garcetti*, presumably, Helm is arguing that a MTD's duty to cooperate with a potential OIG (an external, independent agency, *see* Am. Compl. ¶ 145) investigation as a condition of employment is akin to a deputy district attorney making internal recommendations to a supervisor about whether or not his prosecutor's office should prosecute a case. The Court is unpersuaded and finds that the facts of *Garcetti* are too factually distinguishable to be instructive here.

Helm also cites *Milsap v. City of Chi.*, 2018 WL 3361889, at \*1 (N.D. Ill. July 10, 2018) (*Milsap II*). In *Milsap II*, the plaintiff was an employee of the City of Chicago's Department of Streets and Sanitation. *Id.* at \*1. He alleged, among other things, that the City wrongfully terminated him because he disclosed corruption, favoritism, nepotism, and violations of other laws in the course of an official investigation before the OIG. *Id.* He brought two Section 1983 First Amendment retaliation claims along with other federal and state law claims against the City and City officials. The defendants moved to dismiss, and the court dismissed the plaintiff's First Amendment claims with prejudice. *Id.* In dismissing the claims, the court first explained that whether a government employee's speech "addresses a matter of public concern depends upon 'the content, form and context [of the speech] as revealed by the whole record.'" *Id.* at \*3 (internal citations omitted). And, the court ultimately relied on the general principle that "[w]hen a public employee reports official misconduct in the manner directed by official policy, to a supervisor, or to an external body with formal oversight responsibility, he speaks pursuant to his official duties

and his speech is unprotected by the First Amendment." *Id.* at *3 (citing *Rose v. Haney*, 2017 WL 1833188, at *5 (N.D. Ill. May 8, 2017)) (internal quotations omitted). Again, failing to specifically connect the dots, Helm appears to argue that because Hernandez was a public employee who reported official misconduct to an external body with formal oversight responsibility, he was speaking pursuant to the his official duties and thus, his speech was unprotected by the First Amendment.

*Milsap II*, however, offers little support to Helm as *Milsap II* was decided on a motion to dismiss, not summary judgment. Here, the issue is whether Helm has met his burden that he is entitled to judgment as a matter of law. He has not. Helm fails to point to evidence in the record showing what exactly Hernandez reported as part of the OIG meetings (the "content" of the speech), and Helm fails to address the content, context, and form of Termini's "reporting", which from the record evidence, appears to involved both personal and employment-related matters. Helm has not sufficiently developed this argument. And, "[i]t is not the role of this court to research and construct the legal arguments open to parties, especially when they are represented by counsel." *Vertex Refining, NV, LLC v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 374 F. Supp. 3d 754, 765 (N.D. Ill. 2019) (citing *Doherty v. City of Chi.*, 75 F.3d 318, 324 (7th Cir. 1996), amended (Mar. 28, 1996)). But, as discussed above, Helm is already entitled to summary judgment on the First Amendment claims based on the causal connection element. *See supra* at Section 1.B.iii.

v.  *Monell* **Liability**

The City also argues that because there cannot be Section 1983 *respondeat superior* liability against it, it can only be held liable via a *Monell* claim. City Memo. at 9–12. Plaintiffs' *Monell* claim, however, asserts the City, fails because Plaintiffs have not presented evidence of: an express policy, widespread custom, or action by final policymakers. *Id.*

A municipality may be held liable under Section 1983 only "when execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible for under § 1983." *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 694 (1978). Under *Monell*, "[a] municipality is a 'person' under § 1983 and may be held liable for its own violations of the federal Constitution and laws." *First Midwest Bank, Guardian of the Estate of Michael D. LaPorta v. City of Chi.*, 2021 WL 684365, at *4 (7th Cir. Feb. 23, 2021) (citing *Monell*, 436 U.S. at 690–91). "[A] municipality cannot be held liable for the constitutional torts of its employees and agents" under the doctrine of *respondeat superior*. *Id.* (citing *Monell*, 436 U.S. at 690–91). For a plaintiff to prevail on Section 1983 claim under *Monell*, he "must challenge conduct that is properly attributable to the municipality itself." *Id.* (citing *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403–04 (1997)).

"To prevail on a municipal-liability claim, the plaintiff must show that the injury was caused by "(1) an express policy that would cause a constitutional deprivation if enforced; (2) a common practice that is so widespread and well settled as to constitute a custom or usage with the force of law even though it is not

authorized by written law or express policy; or (3) an allegation that a person with final policy-making authority caused the constitutional injury." *Lopez v. Sheriff of Cook Cnty.*, 2020 WL 1530739, at *10 (N.D. Ill. Mar. 31, 2020) (citing *Lawrence v. Kenosha Cnty.*, 391 F.3d 837, 844 (7th Cir. 2004)) (internal quotation marks omitted). The plaintiff must also how that the policy or custom that inflicted the injury was the "moving force of the constitutional violation." *Richter v. Wexford Health Sources, Inc.*, 2017 WL 2813658, at *5 (N.D. Ill. June 29, 2017) (quoting *Monell*, 436 U.S. at 694).

In Plaintiffs' Response, Hernandez clarifies that he does not allege existence of an express policy. Resp. at 10. He also concedes that the evidence does not show that Helm or Martin are final policymakers, and to the extent the complaint alleges so, he withdraws such allegations. Accordingly, his *Monell* claim is the second type—specifically, that a "widespread practice existed as to trading lucrative assignments and overtime for political work . . . ." *Id.*

For a widespread custom *Monell* claim, a "municipality may only be held liable where it is the moving force behind the injury because some policymaker made a deliberate choice to act or not act in a certain way." *Latuszkin v. City of Chi.*, 250 F.3d 502, 505 (7th Cir. 2001). Moreover, "what is needed is evidence that there is a true municipal policy at issue, not a random event." *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005). "If the same problem has arisen many times and the municipality has acquiesced in the outcome, it is possible (though not necessary) to infer that there is a policy at work . . . ." *Id.*

The City argues that Hernandez's *Monell* liability claim fails because: Hernandez cannot establish that he was deprived of overtime opportunities, or that any such deprivation was due to his refusal to engage in politics (City Memo. at 11); he has not shown any actionable deprivations (*id.* (citing *Petty v. City of Chi.*, 754 F.3d 416, 424 (7th Cir. 2014))); and he cannot establish both "officials' awareness of the risk created by the custom and their failure to take appropriate steps to protect them from it." (*id.* (citing *Doe v. Vigo Cnty.*, 905 F.3d 1038, 1045 (7th Cir. 2018))).

Hernandez responds that the City's overtime records show a widespread disparity in overtime distribution from 2015 through 2017. Resp. at 10–11. Hernandez argues that these records combined with his own testimony that he observed many of the top overtime earners at Helm-requested political events, lead to the inference that Helm and the City were rewarding political favors with more overtime and better assignments. *Id.* at 11. He maintains that this combination of evidence shows that the City's practice was long-standing, frequent, and common. *Id.* Hernandez also argues that he produced evidence of deliberate indifference by City and DOA officials based on his reporting of issues to both City and DOA officials and their inaction. *Id.* at 12–13 (citing PSOF ¶¶ 3, 4, 13).

Hernandez does not argue that he has presented direct evidence of a widespread practice of trading lucrative assignments and overtime for political work. Instead, he maintains that he has proffered evidence that allows the Court to make such an inference. Resp. at 10–11. The Court disagrees. The overtime records do not change the fact that he has failed to present evidence showing overtime opportunities,

44

as opposed to just earned overtime, which forms the basis of his claim. The overtime records reveal nothing about opportunities, and, moreover, do not even show deprivation of overtime itself or what overtime he would have received absent the City's deliberate indifference. Hernandez also fails to present evidence related to deprivation of lucrative assignments that he otherwise would have received. Additionally, as the City correctly points out, he has not shown any connection between any overtime opportunities or lucrative assignments for DOA employees based on political favoritism. Reply at 7. This is enough to defeat Hernandez's basis for *Monell* liability.

All in all, based on the foregoing, the Court grants summary judgment to Helm on Counts I, III, and V, and the City on Count II.

## II. Whistleblower Claims

Plaintiffs also bring two whistleblower claims under the IWA, and Defendants move for summary judgment on both claims. In Count IV, Plaintiffs allege that as a result of their refusal to engage in political activities and their corresponding participation in the OIG investigation, Defendants retaliated against Plaintiffs by depriving them of overtime, preferred assignments, and equipment, and by bullying, harassing, and segregating them. Am. Compl. ¶ 175–76, 182–83. Additionally, they claim that Defendants imposed baseless and retaliatory discipline upon Termini. *Id.*

In Count VI, Plaintiffs allege that Defendants retaliated against them based on Plaintiffs' filing of their original complaint, which discloses a violation of state and federal laws, rules, and/or regulations and their cooperation with the OIG. Am.

45

Compl. ¶ 198. They allege that Defendants created an extreme and hostile work environment for Plaintiffs, including allowing third-party reprisals such as union representatives' campaign of berating, belittling, and undermining Plaintiffs. *Id.* ¶ 200.[7]

Defendants argue that a one-year statute of limitations applies to the IWA claims and that claims based on actions before November 17, 2017 are time-barred. City Memo. at 15; Helm Memo. at 24. Helm also argues that he cannot be liable under the IWA because it does not allow for individual liability. Helm Memo. at 17–18. Alternatively, Defendants contend that Plaintiffs have failed to present evidence satisfying each of the elements for their IWA claims. City Memo. at 12–24; Helm Memo. at 17–24.

"The purpose of the IWA is to protect employees from adverse employment actions in retaliation for reporting or refusing to engage in unlawful conduct by their employer." *Huang v. Fluidmesh Networks, LLC*, 2017 WL 3034672, at *6–7 (N.D. Ill. July 18, 2017). At the outset, the Court notes that Plaintiffs fail to specify in their amended complaint which section of the IWA apply to their claims. Nevertheless, both Plaintiffs and Defendants reference Sections 15(b) and 20 of the IWA in their briefs. Accordingly, the Court evaluates Plaintiffs' claims under these sections.

Under the IWA, an employer may not retaliate against an employee, among other reasons:

> for disclosing information to a government or law enforcement agency, where the employee has reasonable

---

[7]The Court agrees with the City that Plaintiffs' disclosures to the media are not covered by the IWA. City Memo. at 16 n.7 (citing Am. Compl. ¶ 201).

cause to believe that the information discloses a violation a
State or federal law, rule or regulation. 740 ILCS 174/15 (b);
or

for refusing to participate in an activity that would result in
a violation of a State or federal law, rule or regulation. 740
ILCS 174/20.

While the Plaintiffs do not address Section 15(a), Helm argues that that
Plaintiffs admitted that Helm did not retaliate against them after they filed their
complaint, and that their Section 15(a) claim fails. Helm Memo. at 17–18.

Section 15(a) of the IWA provides that, "[a]n employer may not retaliate
against an employee who discloses information in a court, an administrative hearing,
or before a legislative commission or committee, or in any other proceeding, where
the employee has reasonable cause to believe that the information discloses a
violation of a State or federal law, rule, or regulation." 740 ILCS 174/15(a). The Court
agrees with Helm based on its prior analysis of any post-complaint retaliation—there
is no evidence of such retaliation. Accordingly, to the extent Plaintiffs have any claim
under Section 15(a), the Court finds that as a matter of law, Plaintiffs cannot prevail
on such a claim. The same holds true for any alleged post-complaint retaliation under
Count VI.

The Court now addresses Defendants' remaining arguments one by one.

## A. Statute of Limitations

The City and Helm argue that Plaintiffs' IWA claims based on any actions
before November 17, 2017 are time-barred based on the one-year statute of
limitations that applies to IWA claims. City Memo. at 15 (citing *Elue v. City of Chi.*,

2017 WL 2653082, at *8 (N.D. Ill. June 20, 2017) (*Elue I*)); Helm Memo. at 24. Plaintiffs respond that the statute of limitations does not apply because of the continuing violation rule, and accordingly, their claims are not time-barred. Resp. at 16–17 (citing *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 85 (Ill. 2003)).

As a preliminary matter, all parties appear to assume that the one-year statute of limitations contained in the Illinois Tort Immunity Act applies to the IWA.

In *Elue I*, the district court held that the Illinois Tort Immunity Act's one-year statute of limitations (citing 745 ILCS 10/8-101(a)) also applies to IWA claims, but only to claims seeking damages, not equitable relief. 2017 WL 2653082, at *8–9. However, the parties ignore the Seventh Circuit, which has stated instead that "[i]t is unclear under Illinois law whether this statute of limitations applies to retaliatory discharge claims under the Illinois Whistleblower Act." *Williams v. Off. of Chief Judge of Cook Cnty. Ill.*, 839 F.3d 617, 627 (7th Cir. 2016). In *Williams*, the Seventh Circuit, instead of "attempting to resolve this question," concluded that the plaintiff's whistleblower claims under the IWA did not meet the summary judgment standard on other grounds. *Id.* Like in *Williams*, the Court need not decide the statute of limitations issue, as it can resolve Defendants' motions on other grounds, as set forth below.

That being said, the Court notes that to the extent the one-year statute of limitations applies to IWA claims, the one-year statute of limitations does not apply to any equitable relief sought in Counts IV and VI. *See Elue I*, 2017 WL 2653082, at *8–9.

48

### B. Helm's Liability Under the IWA

Helm argues in a footnote that there is no individual liability under the IWA, and thus, he cannot be held liable. Helm Memo. at 17 n.3 (citing *Martorana v. Vill. of Elmwood Park*, 2013 WL 1686869 (N.D. Ill. Apr. 18, 2013) and *Parker v. Ill. Human Rights Comm'n*, 2013 WL 5799125 (N.D. Ill. Oct. 25, 2013)). Again, Plaintiffs do not respond to this argument. As an initial matter, it is inappropriate to make arguments in a footnote and Helm waives this argument by raising it only in a footnote. *See Cascades AV LLC v. Evertz Microsystems Ltd.*, 335 F. Supp. 3d 1088, 1097–98 (N.D. Ill. 2018) (internal citations omitted); *Fuery v. City of Chi.*, 2016 WL 5719442, at *14 (N.D. Ill. Sept. 29, 2016) ("Arguments raised only in footnotes are waived.").

No matter, as the legal authority is not as clear cut as Helm suggests. Even though courts refused to impose individual liability under the IWA in the cases Helm references, more recent cases have taken a different position. In these cases, courts in this District have held that claims under the IWA are permissible against individuals who are agents of an employer. *See Logan v. City of Chi.*, 2018 WL 5279304, at *5 (N.D. Ill. Oct. 24, 2018) ("The definition of 'employer' under IWA includes 'an individual,' as well as 'any person acting within the scope of his or her authority express or implied on those entities in dealing with its employees.'" (citing 740 ILCS 174/5)); *Bernero v. Vill. of River Grove*, 2018 WL 3093337, at *6 (N.D. Ill. June 22, 2018) ("Under the IWA an 'employer' may be 'any [ ] entity that has one or more employees in this State,' and 'any person acting within the scope of his or her

authority express or implied on behalf of those entities in dealing with its employees.'" (citing 740 ILCS 174/5)).

Accordingly, the Court declines to hold that Helm cannot be liable under the IWA.

### C. Section 15(b) IWA Claim

Pursuant to Section 15(b) of the IWA, "[a]n employer may not retaliate against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of a State or federal law, rule, or regulation." 740 ILCS 174/15(b). "To succeed on a 15(b) claim, a plaintiff must show: (1) an adverse employment action by his employer; (2) which was in retaliation; (3) for the employee's disclosure to a government or law enforcement agency; (4) of a suspected violation of an Illinois or federal law, rule, or regulation." *Rufus v. City of Chi.*, 2019 WL 1572545, at *6 (N.D. Ill. Apr. 11, 2019) (citing *Elue v. City of Chi.*, 2018 WL 4679572, at *8 (N.D. Ill. Sept. 28, 2018) (*Elue II*)).

First, the City argues that Plaintiffs did not engage in "disclosure," and that on this basis, their claim fails. City Memo. at 17, 21. It asserts that because the OIG commanded Hernandez to appear at its offices for interviews in April and August of 2018, Hernandez was not "disclosing" any information to the OIG that the OIG did not already know. *Id.* at 17. It also argues that Termini appeared before the OIG in August 2018 because he himself was the subject of an investigation relating to unethical behavior. *Id.* at 21.

Plaintiffs counter that they were engaged in the process of "disclosing" when they spoke to the OIG during each of the aforementioned instances. Resp. at 18–20; 22–24. They also correctly point out that the City does not cite to any case law to support its argument. *Id.* The Court agrees. The evidence before the Court reveals that Hernandez discussed political favoritism with the OIG in January 2018 and complained about Helm's requests for Hernandez to procure money for Alderman Pat O'Connor's political campaign. Pls.' Resp. DSOF ¶ 75; Defs.' Resp. PSOF ¶ 3. The City seemingly ignores these facts. However, the City is correct that in August 2018, the OIG commanded Termini to appear at its offices, and he was told that he was the subject of an investigation related to political activity on duty and falsifying time. Pls.' Resp. DSOF ¶ 78.

That said, however, the City offers no authority on what types of behavior or communication constitutes "disclosure." And, "[i]t is not the role of this court to research and construct the legal arguments open to parties, especially when they are represented by counsel." *Vertex Refining, NV, LLC*, 374 F. Supp. 3d at 765 (citing *Doherty*, 75 F.3d at 324). Accordingly, the Court cannot conclude that there is no genuine issue of material fact as to whether Plaintiffs "disclosed" to the OIG.

Second, the City asserts that Hernandez's communications with the OIG revealed potential violations of the City's Ethics Ordinance but not any violation of a state or federal law, rule, or regulation. City Memo. at 17. It makes the same argument with respect to Termini's discussions with the OIG. *Id.* at 21. The City contends that because the IWA requires a disclosure of a violation of a federal or State

law, rule or regulation, Plaintiffs' activities were not protected by the IWA. City Memo. at 17 (citing *Milsap v. City of Chi.*, 2019 WL 4749971, at \*6 (Sept. 30, 2019) (*Milsap III*)). Plaintiffs ignore this argument entirely in their Response. Again, their failure to respond to this argument results in waiver. *See Bonte*, 624 F.3d at 466. Moreover, they fail to point to any federal or state law that was the subject of their discussions with the OIG.

Instead, Plaintiffs counter that the City overstated the standard applicable to Section 15 IWA claims by insisting that Plaintiffs must have had to disclose "actual illegal activity" instead of what they reasonable believed to be illegal. Resp. at 20, 23. For support, Plaintiffs cite to a *Milsap* opinion but ignore that this ruling was at the motion to dismiss stage, not the motion for summary judgment stage. Resp. at 20, 23 (citing *Milsap v. City of Chi.*, 2018 WL 488270 at \*7–9 (N.D. Ill. Jan. 19, 2018) (*Milsap I*)). In fact, Plaintiffs reference an altogether different *Milsap* opinion than the one which the City references. *Milsap III*, which the City cites to, was decided at the summary judgment stage. The court granted summary judgment to the defendant and against the plaintiff, basing its ruling partially on the fact that the plaintiff's disclosure of a City ordinance violation was not covered by the IWA. 2019 WL 4749971, at \*6. In doing so, it found that the plaintiff's disclosure of the City's governmental ethics ordinance was "not only not a federal or state law, rule, or regulation, as required under the plain language of the IWA" but also not a criminal statute, which remains the IWA's primary focus. *Id.* Similarly, here, neither Plaintiff disclosed to the OIG any violation of a federal or state law, rule, or regulation.

52

Plaintiffs also respond that they were reporting conduct they perceived to be illegal that implicated criminal statutes related to official misconduct, bribery, and intimidation. Resp. at 20, 23–24. Yet, Plaintiffs have not presented any evidence whatsoever to support their belief that any proposed conduct was criminal in nature or that they made such a representation to the OIG. The Court agrees with the City that the IWA cannot cover Plaintiffs' Section 15(b) claim.

Third, both the City and Helm make similar arguments on the nature of actions suffered by Plaintiffs. "Retaliation, short of termination, under the IWA is defined as an act or omission that would be materially adverse to a reasonable employee. A materially adverse employment action is one that significantly alters the terms and conditions of the employee's job. Not everything that makes an employee unhappy is an actionable adverse action. Otherwise, minor and even trivial employment actions that an employee did not like would form the basis of a discrimination suit." *Elue I*, 2017 WL 2653082, at *5 (internal citations and quotations omitted).

The City contends that the alleged adverse actions Hernandez suffered, specifically his changes in assignments and vehicles, were not materially adverse, as required by the IWA. City Memo. at 18.[8] It also argues that any actions involving Termini occurred before his August 2018 interview with the OIG and, therefore, are not actionable. *Id.* at 22. Helm similarly argues that many of the purported adverse

---

[8]The City concedes that its decision not to interview Hernandez for an Equipment Training Specialist position and his two-day suspension are considered materially adverse. City Memo. at 21. But, Plaintiffs clarify that these actions are not alleged in the Amended Complaint and not at issue in this suit. Resp. at 22.

actions Plaintiffs suffered do not rise to the standard of materially adverse actions required by the IWA. Helm Memo. at 18–19. Plaintiffs respond that Hernandez's loss of overtime and preferred assignments and Termini's transfer out of the training section were in fact materially adverse. Resp. at 21. Plaintiffs focus on these three actions only.

As an initial matter, the earliest OIG communication for either Plaintiff occurred in January 2018 so any actions by Defendants before then cannot be in retaliation for Plaintiffs' communications with the OIG. *See* Pls.' Resp. DSOF ¶ 74. The Court has already determined that Plaintiffs have failed to present evidence showing that Hernandez lost any overtime, overtime opportunities, or any preferred vehicle or job assignments. *Supra* Section I.B.ii. Moreover, the Court has already determined that there is no genuine issue of material fact that any changes to Hernandez's job and vehicle assignments were not materially adverse. *Id.* Accordingly, these alleged actions cannot pass muster as adverse actions. Even though Termini's removal from the training program remains in dispute, this action occurred in September 2016, well before his communications began with the OIG. Pls.' Resp. DSOF ¶ 54.

Fourth, both the City and Helm argue that Plaintiffs have failed to provide any evidence showing a causal connection between their refusal to engage in protected activity and Defendants' alleged retaliation. City Memo. at 18–20, 22–23; Helm Memo. at 19–21. "In order to show whistleblower retaliation, a plaintiff must provide some evidence that the employer had a retaliatory motive." *Williams*, 839 F.3d at 627.

Plaintiffs argue that they have provided sufficient evidence to show that Defendants acted to retaliate against them. Resp. at 24–25.

Yet, the Court agrees with Defendants that Plaintiffs have failed to show that they had a retaliatory motive. Plaintiffs offer no cognizable response to Defendants' causation arguments regarding retaliatory conduct directed towards Hernandez for their Section 15(b) IWA claim (or Section 20 IWA claim for that matter). Nonetheless, similar to the causation analysis above (s*upra* Section I.B.iii), the Court finds that Plaintiffs have failed to offer evidence showing that Defendants acted in retaliation for Plaintiffs' communications with the OIG. Hernandez received a two-day suspension in February 2019 as a result of his saying "fuck this" and walking out of a meeting. Pls.' Resp. DSOF ¶ 95.

The same holds true for Termini. Termini received disciplines in 2018 for his *own* actions: a five-day discipline for insubordination for disrupting a September 18, 2018 safety standards meeting "by yelling and publicly challenging management's decisions on safety vests, speeding and uniforms and then walking out of the meeting;" a ten-day discipline for distributing the "No Confidence" letter to his co-workers during work time; and a fifteen-day discipline for saying "bring it on pussy" on a two-way radio. Pls.' Resp. DSOF ¶ 99. Termini never served his suspensions and did not lose any pay either. *Id.* ¶ 102. Additionally, even though he testified that he was subject to name-calling (DSOF ¶ 113), Plaintiffs present no evidence that the name-calling was the result of his whistleblowing actions. Plaintiff's claim that Termini has produced evidence of "suspicious timing *and* disparate treatment of

similarly situated employees" is based on conjecture alone. *See* Resp. at 24. This cannot support their claim.

Overall, the Court finds that Defendants have met their burden that there is no genuine dispute of material facts, and Plaintiffs have failed to present evidence that could raise an issue of material fact as to Plaintiffs' Section 15(b) claim. As such, Defendants are entitled to summary judgment as a matter of law for Plaintiffs' Section 15(b) claim.

### D. Section 20 IWA Claim

Pursuant to Section 20 of the IWA, "[a]n employer may not retaliate against an employee for refusing to participate in an activity that would result in a violation of a State or federal law, rule, or regulation, including but not limited to, violations of the Freedom of Information Act.." 740 ILCS 174/20. To sustain a Section 20 IWA claim, a plaintiff must establish that "(1) he refused to participate in an activity that would result in a violation of a state or federal law, rule, or regulation, and (2) his employer retaliated against him because of that refusal." *Huang v. Fluidmesh Networks, LLC*, 2017 WL 3034672, at *4 (N.D. Ill. July 18, 2017) (internal citations and quotations omitted).

The parties advance similar arguments as those they put forth for the Section 15(b) claim, and Plaintiffs do not provide any additional authority warranting a different result. The Court finds that Plaintiffs have failed to show that they refused to participate in any activity that would result in a violation of a state or federal law, rule, or regulation, or that Defendants retaliated against them as a result. Again,

Defendants have met their burden to show that there is no genuine dispute of material facts, and Plaintiffs have failed to present evidence that could raise an issue of material fact as to Plaintiffs' Section 20 IWA claim. As such, Defendants are entitled to judgment as a matter of law for Plaintiffs' Section 20 IWA claim.

The Court grants summary judgment in favor of Defendants on Counts IV and VI.

### III. Indemnification Claim

Finally, in Count VII, Plaintiffs seek to hold the City liable for any damages awarded against Helm based on his alleged actions. Am. Compl. ¶ 203. Because the Court is granting summary judgment in favor of Helm and against Plaintiffs for all counts implicating Helm, the Court must grant summary judgment in favor of the City on Count VII.

### Conclusion

For the reasons given above, the Court grants Defendants' motions for summary judgment, and enters summary judgment as follows: in favor of Helm and against Hernandez on Count I; in favor of the City and against Hernandez on Count II; in favor of Helm and against Plaintiffs on Counts III and V; in favor of Defendants and against Plaintiffs on Counts IV and VI; and in favor of the City and against Plaintiffs on Count VII. This civil case is terminated.

Dated: August 4, 2021

United States District Judge
Franklin U. Valderrama